# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| MARTHA SELF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:98-cv-02581-JEO |
| | ) | |
| BELLSOUTH MOBILITY, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

### Table of Contents

I.    INTRODUCTION ...................................................... 3
II.   BACKGROUND ....................................................... 3
III.  STATEMENT OF FACTS ............................................... 7
      A. The Plaintiff's Contract ..................................... 7
      B. The Telecommunications Act of 1996 ........................... 8
      C. The FCC's Initial Orders Pursuant to the 1996 Act ........... 11
      D. The Fourth Order on Reconsideration ......................... 13
      E. Establishment of the Universal Service Administrative Company ("USAC") ...... 14
      F. The *Texas Office* Decision ................................. 17
      G. BellSouth's Petition to the FCC and Motion to Stay the Self Case ............. 18
      H. The 2002 FCC Order Discussing Then Current Universal Service Rules and
         Changes to the Rules ........................................ 18
      I. Plaintiff's Amended Complaint and the 2005 Bureau Order ..................... 21
      J. The 2008 FCC Order .......................................... 21
IV.   SUMMARY JUDGMENT STANDARD ....................................... 25
V.    DISCUSSION ...................................................... 27
      A. Overview .................................................... 27
      B. The Plaintiff's Claims ...................................... 28
      C. Analysis .................................................... 29
         1. Jurisdiction of Any FCA Claim – Generally ................ 29
         2. Application of Section 2342 .............................. 34
         3. The Universal Service Order is Void *ab Initio* ......... 35
         4. There is No Order Because Cingular's Actions Were Voluntary ............. 36
         5. Cingular's Voluntary Action ............................. 40
         6. Self is Not a "Party" to Any FCC Proceeding ............. 41

7. No Challenge to the FCC's Fourth Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
8. Jurisdiction on the Plaintiff's State Law Claims . . . . . . . . . . . . . . . . . . . . . . . . 46
   a. Contract Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   b. Unjust Enrichment and Conversion Claims . . . . . . . . . . . . . . . . . . . . . . . . . 48
   c. Fraud Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
   d. Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
D. Preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
  1. Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
  2. Conflict Preemption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
  3. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
   a. The *Universal Service Fund Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
   b. The State Law Claims in Paragraphs 24(a), 30(b), and 36(d) of the
      Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
   c. The State Law Claims in Paragraphs 24(b), 24(c), 30(a), and 30(c) of the
      Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
   d. The Plaintiff's State Law Claims in Paragraphs 24(c), 24(d), 24(e), 24(f),
      24(g), 30(d), 30(e), 30(f), and 30(h) in the Complaint . . . . . . . . . . . . . . . . . 57
   e. The Plaintiff's State Law Claims in Paragraphs 33(a) through 33(d), 36(a)
      through (e), and 37 of the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
   f. The Plaintiff's FCA Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
VI. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

## I.   INTRODUCTION

This case is before the court on cross motions for partial summary judgment.  (Doc. 137 and 138).[1]  Defendants BellSouth Mobility, Inc. (hereinafter "BMI"), American Cellular Communications, LLC, and American Cellular Communications Corporation (hereinafter collectively "Cingular" or "the defendants")[2] argue that the plaintiff's claims are preempted and/or are a collateral attack on final orders of the Federal Communications Commission (hereinafter "FCC"), and thus, not properly before this court.  (Doc. 138).  The plaintiff, Martha Self (hereinafter "Self" or "the plaintiff"), moves the court to determine that it does have jurisdiction over her claims.  (Doc. 137).  Because the issues clearly overlap, the court will address both motions together.

## II.   BACKGROUND

This case was removed to this court from the Circuit Court of Jefferson County on October 9, 1998.  (Doc. 1).  The plaintiff (for herself and as a putative class representative) alleges that Cingular improperly recovered its contributions to the Universal Service Fund ("USF") from its customers in violation of the Federal Communications Act ("FCA").  Cingular answered the complaint, asserting, among other things, that its actions in collecting the fee were permitted by FCC regulations and were necessary to recover Cingular's USF contributions.

Under the Telecommunications Act of 1996, providers of "commercial mobile radio service" ("CMRS"), such as Cingular, were required to contribute to a program to offset the cost of providing cellular service to rural customers.  The amount due from each CMRS provider was

---

[1]The plaintiff and the defendants' briefs in support of their motions are located at documents 141 and 144, respectively.  The responses are found at documents 147 and 150, respectively.  The replies are located at documents 153 and 152, respectively.

[2]Cingular Wireless, LLC, is now AT&T Mobility, LLC, but for purposes of this action, the court will refer to it as Cingular, as the parties do in their pleadings.

determined by the FCC and collected on a monthly basis from the CMRS carriers by the Universal Service Administrative Company ("USAC"), which was designated by the FCC as the "administrator" of the program.  *See* 47 C.F.R. Part 54.  Under this newly expanded program, the FCC set up two different funds to achieve its goal of universal service.  Each was funded differently.  The first fund was intended to subsidize the expensive and unprofitable rural customers and drew its funding from interstate and international revenues of the CMRS providers.  *Id*.  The second fund was intended to support schools, libraries, and health care facilities and drew its funding from intrastate as well as interstate and international revenues of the CMRS providers.  *Id*.

In a December 30, 1997 order, the FCC stated, among other things, that CMRS carriers were permitted to recover the universal service charges that they were required to pay to the FCC from both their interstate and intrastate customers.  *See* Fourth Order on Reconsideration in Docket No. 96-45, Report and Order in CC Docket Nos. 96-45, 96-262, 94-1, 91-213, 95-72, ¶ 309 (hereinafter "Fourth Order on Reconsideration") (Cingular Ex. 7).[3]  The order stated that CMRS carriers were *permitted*, but not required, to recover the universal service charges from their customers.  *Id*.  Premised on this order, the defendants, as well as other CMRS providers, recovered their universal service fees from both interstate and intrastate customers.

On July 30, 1999, the Fifth Circuit Court of Appeals decided *Texas Office of Public Utility Counsel v. Federal Communications Commission*, 183 F.3d 393 (5th Cir. 1999) ("*Texas Office*").  Therein, the court held, in part, that the FCC had "exceeded its jurisdictional authority when it assessed contributions for [the 47 U.S.C. ] § 254(h) 'schools and libraries' programs

---

[3]This exhibit is located at document 145-7 in the court's electronic filing system.

based on the combined intrastate and interstate revenues of interstate telecommunications

providers and when it asserted its jurisdictional authority to do the same on behalf of high-cost

support." *Texas Office*, 183 F.3d at 409.  The court's mandate was made effective November 1,

1999.

The FCC responded to the *Texas Office* decision by issuing an order prospectively

eliminating universal fees based on intrastate revenues effective November 1, 1999.  The FCC

order stated that the FCC would not base the amount of universal service fees collected by the

FCC from the CMRS carriers on the combined interstate and intrastate revenues of the CMRS

carrier.  However, the order did not address whether the amount collected could be recovered by

the CMRS carriers from both their interstate and intrastate customers.

BellSouth Corporation, the parent company of BellSouth Mobility (predecessor of

Cingular) filed a petition with the FCC on December 6, 1999, seeking reconsideration and

clarification of certain matters raised by the decision in *Texas Office*.  (Doc. 53, Ex. C).

Specifically, direction was sought from the FCC concerning whether it may retain the universal

service fees recovered from its customers on intrastate revenues prior to the *Texas Office*

decision and whether it may continue to recover the allowable costs of the universal fees through

charges on their intrastate and interstate subscriber-customers.  *Id*.  Upon motion by the

defendants, this action was stayed pending FCC ruling on BellSouth's petition.  (Doc. 74).

On August 22, 2005, the FCC released its ruling on BellSouth's petition.  (Doc. 145-8

(Cingular Ex. 8), "Order on Petition for Reconsideration and Clarification of the Fifth Circuit

Remand Order of BellSouth Corporation," CC Docket 96-45, 96-262 (hereinafter "2005 Bureau

Order")).  The FCC held that CMRS providers may recover their universal service contributions

5

through rates charged for all of their services and that the FCC's decision in the Fifth Circuit

Remand Order applied the Fifth Circuit decision prospectively beginning November 1, 1999.[4]

*Id*. at 1.  The Commission declined to address BellSouth's request for reconsideration of the

Commission's decision to implement the Fifth Circuit's decision on a prospective basis or

BellSouth's request for refund of its universal service fund contributions based on intrastate

revenues, instead choosing to address the matter in a subsequent order.  *Id*. at n.16.

Shortly after the issuance of the Commission's ruling and the subsequent lifting of this

Court's Order to Stay Proceedings in this case, Cingular filed a third-party complaint against

USAC and the FCC in this matter.  (Doc. 105).  In its third-party complaint, Cingular alleged that

"Cingular has acted in accordance with the FCC's and USAC's rules and regulations in making

contributions to the USF and in recovering its USF contributions from customers."  *Id*. at ¶ 10.

Cingular further asserted that the FCC and/or USAC would be liable to it for some or all of any

judgment that the plaintiff might recover from it.  *Id*. at ¶¶ 15, 25.  In the amended third-party

complaint, Cingular also asserted as follows:

> The Plaintiff has made averments of the Federal Communications Act and the
> 1996 Act that if established would also establish that Cingular's USF
> contributions were wrongfully exacted by USAC or the FCC or both.
> Accordingly, Cingular would be entitled to restitution from USAC or the FCC or
> both of the amounts wrongfully exacted.

(Doc. 125 at ¶ 17).  Cingular further alleged:

> The Plaintiff has made averments with respect to the response of USAC and the
> FCC to the *Texas Office* decision that if established would also establish that
> Cingular's USF contributions were wrongfully exacted by USAC or the FCC or
> both.  Accordingly, Cingular would be entitled to restitution from USAC or the

---

[4]The remand order is located at In the Matters of Federal-State Joint Board on Board Universal Service Access Charge Reform, 15 F.C.C.R. 1679, 15 FCC Rcd. 1679, 1999 WL 809713 (F.C.C.) (hereinafter "Fifth Circuit Remand Order").  The order also is located at document 145-13 (Cingular Ex. 13) in the record.

FCC or both of the amounts wrongfully exacted.

*Id*. at ¶ 28.  On September 29, 2006, this court entered an order dismissing Cingular's third-party complaint.

On April 11, 2008, the FCC issued its Order on Reconsideration in which it addressed that portion of BellSouth's motion to reconsider that it had declined to address in its previous order – that is, BellSouth's request that the Commission reconsider its decision to implement *Texas Office* prospectively and BellSouth's request for a refund.  2008 WL 1722044 (FCC).  In its Order, the FCC denied BellSouth's request for a refund and affirmed the decision made in the Fifth Circuit Remand Order to apply *Texas Office* prospectively.

## III.    STATEMENT OF FACTS

### A.    The Plaintiff's Contract

On February 20, 1995, the plaintiff entered into a service contract for cellular telephone service with BellSouth Mobility Inc.  (Doc. 145-1).  Paragraph 8(b) of the service contract provides:

> Customer shall be responsible for payment of charges for all services furnished by Company, including without limitation; Service connection charges, monthly access charges, charges for air time associated with calls originated by or completed to Customer's cellular access number and charges for enhanced features as well as other charges billed to Customer's cellular access number, including sales and use taxes, other taxes required by law, fees or other exactions imposed by or for any municipal or other political authority against Company.

(Doc. 145-1 (Cingular Ex. 1), "Terms and Conditions of Cellular Agreement," p. 4 at ¶ 8(b)).

Paragraph 21 of the service contract provides:

> Subject to regulatory requirements, Company agrees for extended agreements that it will not increase air time charges per minute or monthly access charges to Customer during the first 12 months of agreement as set forth in this paragraph.…

> The limitation on rate increases under this paragraph shall apply only to air time charges per minute and monthly access charges and Company shall have the option to adjust rates, terms and conditions except as limited herein upon at least 30 days' written notice to Customer and Customer agrees to pay pursuant to such revised rates, terms and conditions unless Customer terminates this agreement as provided herein.

*Id*., "Extended Agreement," p. 5 at ¶ 21(b).  Paragraph 19 of the service

contract further provides:

> Unless Customer or Company terminates this agreement as provided herein, and except as otherwise agreed, upon completion of any initial term of this agreement, this agreement shall renew on a month-to-month basis.  Customer may terminate this agreement by notifying Company at least 15 days prior to the expiration date of the initial term or any renewal term.  Upon receipt of such 15 days' written notice from Customer, Company will terminate Customer's cellular service with Company.  Notice shall be made in writing to the Company at the address shown on Customer's cellular bill.  Company reserves the right not to renew this agreement at any time prior to the conclusion of the initial or any renewal term by giving Customer notice of same.

(Doc. 145-1, "Terms and Conditions of Cellular Agreement," p. 5 at ¶ 19).

### B.    The Telecommunications Act of 1996

On February 8, 1996, Congress passed the Telecommunications Act of 1996 (the "1996

Act") as amendments to the Communications Act of 1934 (the "Communications Act").  In

§ 254(a) of the Communications Act, Congress enacted provisions to promote and advance

universal service.  (Doc. 145-2 (Cingular Ex. 2), Telecommunications Act of 1996, Pub. L. No

104-104, 110 Stat 5b, § 101, codified at 47 U.S.C.A. § 254(a)).

In § 254(a) of the Act, Congress codified its long-standing commitment to universal

service that was first expressed in § 151 of the Communications Act.  (Doc. 145-3 (Cingular Ex.

3), *In the Matter of Federal-State Joint Board on Universal Service,* CC Docket No. 96-45 (rel.

April 10, 1998), Report to Congress ("1998 FCC Report to Congress"), at p. 6, ¶ 9).  Congress

directed that "policies for the preservation and advancement of universal service" shall be based

on the following principles:

> (1) Quality services should be available at just, reasonable, and affordable rates.

> (2) Access to advanced telecommunications and information services should be provided in all regions of the Nation.

> (3) Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services…that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

> (4) All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

> (5) There should be specific, predictable, and sufficient Federal and State mechanisms to preserve and advance universal service.

> (6) …schools…health care providers, and libraries should have access to [certain defined] …advanced telecommunications services….

> (7) …other principles… [should be adapted as] …are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent [with this Act].

*Id*., at pp. 1-2, Communications Act § 254(b)(1)-(7).

In determining the services that are to be supported by the Federal universal service

support mechanism, Congress directed the FCC to consider the extent to which such services:

> (A) are essential to education, public health, or public safety;

> (B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

> (C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

*Id.*, Communications Act § 254 (c)(1)(A)-(D).

Congress directed that contributions to universal service support mechanisms were to come from telecommunications carriers: "Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service." *Id.*, at p. 3, Communications Act § 254(d).

Congress provided for general categories of telecommunications services and providers that were eligible to receive universal service support: (1) telecommunications carriers designated by state commissions as provided in § 214(e); (2) any public or non-profit health care providers for rural areas; and, (3) educational providers (elementary and secondary schools) and libraries. *Id.* at pp. 3-4, Communications Act, §§ 254(e)-(h).

Congress further directed that "[t]he Commission and the States…ensure that universal service is available at rates that are just, reasonable, and affordable." *Id.* at p. 12, Communications Act § 254(I).  The relevant Report to Congress noted that the universal service support mechanisms that were in place before the 1996 Act were:

> a patchwork quilt of implicit and explicit subsidies at both the state and federal levels.  Charges to long distance carriers and rates for certain intrastate services provided to carriers and to end users were provided above cost, which enabled local telephone companies to keep rates for basic local telephone service at affordable levels throughout the country.  The effect of these subsidies was to increase subscribership levels nationwide by ensuring that residents in rural and high cost areas were not prevented from receiving phone service because of prohibitively high telephone rates.

(Doc. 145-3 (Cingular Ex. 3), 1998 FCC Report to Congress, p. 5 at ¶ 7).

The 1996 Act contained a number of provisions to promote competition in telecommunications.  Congress recognized the vulnerability of the implicit subsidies of universal service to competition.  Congress directed the FCC and the states to restructure their universal service support mechanisms so that subsidies were explicit and so that every telecommunications carrier that provides interstate telecommunications service would contribute.  *Id*. at ¶ 8.

Section 201(b) of the Communications Act (47 U.S.C. § 201(b)) gives the FCC authority to enact rules to implement the requirement that all charges and practices in connection with interstate communications are to be just and reasonable.  (Communications Act, § 201(b); *see also* Doc. 145-4 (Cingular Ex. 4), *In the Matter of Federal-State Joint Board on Universal Service*, Report and Order and Second Further Notice of Proposed Rulemaking, CC Docket No. 96-45, FCC 02-329 (rel. December 13, 2002) ("December 13, 2002 FCC Report and Order"), p. 23 at ¶ 41).

### C.     The FCC's Initial Orders Pursuant to the 1996 Act

On May 7, 1997, the FCC issued its first order implementing the universal service provisions of the 1996 Act.  (*See* Doc. 145-3 (Cingular Ex. 5), 1998 FCC Report to Congress, p. 6 at ¶ 9; *In the Matter of Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, (rel. May 8, 1997), FCC 97-157, Report and Order, 12 FCC Rcd 8776 (1997) (hereinafter "Universal Service Order")).  In the Universal Service Order, the FCC established four broad categories of recipients of universal service support based on Congress's policy directives in §§ 254(b) and (e) of the Communications Act.  The funds were: the high cost fund, low income fund, health care providers fund and schools and libraries fund.  (Doc. 145-5, Universal Service Order, pp. 17-19 and 21, ¶¶ 26, 27, 29, 35).

11

As directed by Congress in § 254(b) and § 254(d), the FCC required all telecommunications carriers that provided interstate service (*i.e.*, service between states) to contribute to the funds.  (Doc. 145-5, Universal Service Order, p. 22 at ¶ 39).  In the Universal Service Order, the FCC ruled that § 254(a) of the Telecommunications Act gave it authority to require contributions from both the interstate and intrastate revenues of carriers.  *Id.*, p. 422, at ¶ 823; Doc. 145-3, 1998 FCC Report to Congress, pp. 97-98, ¶¶ 199, 202.

The FCC assessed contributions from carriers' intrastate and interstate revenues for the schools and libraries and rural health care funds.  But the FCC limited assessment to carriers' interstate revenues for the high cost fund and the low income fund.  (Doc. 145-3 (Cingular Ex. 3), 1998 FCC Report to Congress, pp. 97-98, ¶¶ 199, 200, citing Universal Service Order, p. 417, ¶ 813 and p. 425, ¶ 831).

In a subsequent decision, the FCC created a separate rule for cellular and all other CMRS providers to distinguish between their interstate and intrastate revenues.  The FCC recognized the difficulty for cellular and other CMRS carriers in determining whether a call was intrastate or interstate.  In response, the FCC established "safe harbor" factors where a carrier could report its interstate revenues based on an assumed percentage.  (Doc. 145-6 (Cingular Ex. 6), *In the Matter of Federal-State Joint Board on Universal Service*, CC Docket No. 96-45, FCC 98-278, Corrected Memorandum Opinion and Order and Further Notice of Proposed Rulemaking (rel. October 26, 1998) ("Safe Harbor Order"), p. 4 at ¶ 7; p. 6 at ¶ 12).

In the Universal Service Order, the FCC continued "its historical approach to recovery of universal service support mechanisms," thereby permitting "carriers to recover contributions to universal service support mechanisms through rates for interstate services only."  (Doc. 145-3

(Cingular Ex. 3), 1998 FCC Report to Congress, at ¶¶ 199, 200, citing Universal Service Order, p. 423 at ¶ 825; p. 428 at ¶¶ 837-38).  The FCC permitted carriers to recover their contribution obligations in any manner that was equitable and nondiscriminatory and further required that contributors provide accurate, truthful and complete information regarding the nature of the charge.  (Doc. 145-5 (Cingular Ex. 5), Universal Service Order, p. 424 at ¶ 829; p. 434 at ¶ 844; see also Doc. 145-4 (Cingular Ex. 4), December 13, 2002 FCC Report and Order, pp. 7-8, ¶ 10).  The FCC further noted that carriers may recover their universal service contributions from customers through a separate line item on the customers' bills (provided that the carrier accurately described the charge) and that carriers may recover their contribution costs from their customers (provided they not shift more than an equitable share of their contributions to any customer or group of customers).  (Doc. 145-5 (Cingular Ex. 5), Universal Service Order, p. 424 at ¶ 829; p. 436 at ¶ 855).

### D.     The Fourth Order on Reconsideration

Between July 10, 1997, and January 29, 1998, the FCC modified the Universal Service Order in four "orders on reconsideration."  (Doc. 145-3 (Cingular Ex. 3), 1998 FCC Report to Congress, pp. 6-7, at 9, n.9).  In the Fourth Order on Reconsideration, the FCC ruled that cellular carriers would be allowed to recover their contributions to the universal service fund through rates charged for all their services.  (Doc. 145-7 (Cingular Ex. 7), Fourth Order on Reconsideration, p. 170 at ¶ 309; see also Doc. 145-8 (Cingular Ex. 8) (Bureau Order), p. 1 at ¶ 1; p. 3 at ¶ 6; and p. 5 at ¶ 10)  The FCC created this rule for cellular carriers because: (1) the policy reason for limiting carriers to recovery through interstate rates only was to promote unity between state and federal governments and ensure continued affordability of residential dialtone

service;[5] and (2) allowing recovery through all rates would avoid conferring a competitive advantage on carriers that offer more interstate than intrastate services.  (Doc. 145-7 (Cingular Ex. 7), Fourth Order on Reconsideration, p. 170 at ¶ 309).

      **E.**      **Establishment of the Universal Service Administrative Company ("USAC")**

In the Universal Service Order, the FCC appointed the National Exchange Carrier Association as the temporary administrator of the new universal service support program.  (Doc. 145-5 (Cingular Ex. 5), Universal Service Order, p. 441 at ¶ 866).  Through various orders and proceedings, the FCC directed that the USAC would serve as the single entity responsible for administering all of the universal service support programs.  Effective January 1, 1999, USAC assumed permanent responsibility for performing billing, collection, disbursement and other common functions for all of the universal service fund programs.  (Doc. 145-9 (Cingular Ex. 9), *In the Matters of Changes to the Board of Directors of the National Exchange Carrier Association, Inc.*, CC Docket No. 97-21, FCC 98-306, Third Report and Order in CC Docket 97-21, Fourth Order on Reconsideration in CC Docket 97-21 and Eighth Order on Reconsideration in CC Docket 96-45, pp. 2-3 at ¶ 2; see also (Doc. 145-3 (Cingular Ex. 3), 1998 FCC Report to Congress, p. 5 at ¶ 8).

The FCC found that "universal service contributions constitute a sufficient public interest rationale to justify contract adjustments."  The FCC commented that "[B]y assessing a new contribution requirement, we create an expense or cost of doing business that was not anticipated at the time contracts were signed.  Thus, we find that it would serve the public interest to allow

---

[5]This reason did not apply to cellular carriers because 47 U.S.C. § 332(c)(3) of the Communications Act prohibited states from regulating cellular rates, so cellular carriers' recovery of federal universal service contributions through both interstate and intrastate rates would not encroach on the states' rights.  47 U.S.C. § 332(c)(3).

telecommunications carriers and providers to make changes to existing contracts for service in order to adjust for this new cost of doing business.  We clarify, however, that this finding is not intended to pre-empt state contract laws."  (Universal Service Order, p. 434 at ¶ 851).

When a number of parties appealed the Universal Service Order, the appeals were consolidated at the United States Court of Appeals for the Fifth Circuit.  *See Texas Office of Public Utility Counsel v. Federal Communications Commission*, 183 F.3d 393, 408 (5th Cir. 1999).  One issue, among many, in the appeal was the FCC's decision to require carrier contributions based on carriers' intrastate revenues.  *Texas Office*, 183 F.3d at 408.  Neither the manner in which CMRS carriers recovered contributions from customers nor the Fourth Order on Reconsideration specifically were before the Fifth Circuit Court of Appeals in the *Texas Office* appeal.  Nor did the decision affect the FCC's determination in the Fourth Order on Reconsideration that cellular carriers may recover their contributions from customers through rates charged for all services.  (Doc. 145-8 (Cingular Ex. 8), 2005 Bureau Order, p. 1 at ¶ 1; p. 3 at ¶ 6).

In an order released July 2, 1998, the FCC considered and affirmed its jurisdiction over CMRS providers' rates, terms and conditions of service in the context of a petition by a subcategory of such providers to forbear from exercising its jurisdiction over such carriers under §§ 201 and 202 of the Communications Act (47 U.S.C. §§ 201 & 202).  (See Doc. 145-10 (Cingular Ex. 10), *In the Matter of Personal Communications Industry Associations Broadband Personal Communications Services Alliance Petition for Forbearance for Broadband Personal Communications Services*, WT Docket No. 98-100, FCC 98-134, Memorandum Opinion and Order and Notice of Proposed Rulemaking (rel. July 2, 1998) ("Wireless Forbearance Order"), p.

15

13 at ¶¶ 25-26).  In its order, the FCC held:

> In addition, if we were to forbear from enforcing sections 201 and 202, parties would likely turn to the courts for relief from perceived unjust and unreasonable carrier practices.  We believe that since the courts lack the Commission's expertise, developed over decades, in evaluating carriers' practices, carriers would face inconsistent court decisions and incur unnecessary costs.  This could result in consumers receiving differing levels of service and protection depending upon the jurisdiction in which they live, contrary to the intent of Congress in amending section 332(c).

*Id*. (Wireless Forbearance Order), pp. 15-16 at ¶ 30.

In January 1998, Cingular notified the plaintiff that it would be assessing her a "per-line" universal service support charge starting with the January billing cycle.  (Doc. 95 (Amended Complaint) at ¶ 10).  On September 9, 1998, Self filed her action in the Jefferson County, Alabama Circuit Court against Cingular and other cellular carriers.  The action alleged only state law causes of action.  The case was timely removed to this court.  Because Self had cellular service only with BMI (now Cingular), all the defendants other than Cingular were dismissed.

In an order released May 11, 1999, the FCC determined that it would hold cellular providers responsible for complying with standardized labels for charges resulting from federal regulatory action if and when such requirements are adopted by the FCC.  (Doc. 145-11 (Cingular Ex. 11) (hereinafter "Truth-in-Billing Order"), *In the Matter of Truth-in-Billing and Billing Format*, CC Docket No. 98-170, FCC 99-72, First Report and Order and Further Notice of Proposed Rulemaking (rel. May 11, 1999), p. 11 at ¶ 18).  The FCC expressly "decline[d]…to limit the manner in which carriers recover these costs of doing business."  *Id*., p. 32 at ¶ 50.

The FCC further ruled that cellular providers remain subject to the reasonableness and non-discrimination provisions of §§ 201 and 202 of the Communications Act with respect to

their billing practices.  *Id.*, p. 11 at ¶ 19.  The FCC also held that "[c]harges resulting from federal regulatory action are 'charges, practices [or] classifications…for and in connection with' interstate communication service pursuant to section 201(b)...."  *Id.*, p. 31 at ¶ 49.

In 2005, the FCC reaffirmed that under Section 201(b), the universal service costs and other related administrative costs may be recovered through separate line items consistent with the FCC's Truth-in-Billing rules.  (Doc. 145-12 (Cingular Ex. 12) (hereinafter "Second Truth-in-Billing Order"), *In the Matter of Truth-in-Billing and Billing Format*, CC Docket No. 98-170, *National Association of State Utility Consumer Advocates' Petition for Declaratory Ruling Regarding Truth-in-Billing*, CG Docket No. 04-208, FCC 05-55, ¶ 28 (released Mar. 18, 2005), *rev'd on other grounds, National Association of State Utility Consumer Advocates v. FCC*, 457 F.3d 1238 (11th Cir. 2006)).

### F.    The *Texas Office* Decision

On July 30, 1999, the Fifth Circuit Court of Appeals issued an opinion in *Texas Office*. The Fifth Circuit found, among other things, that the FCC exceeded its jurisdiction in basing carriers' contributions to the schools and libraries and the healthcare funds on intrastate revenues. *Texas Office*, 183 F.3d at 447-48.  The Fifth Circuit did not order the FCC or USAC to refund or readjust the funds that it collected before it handed down its decision.  *Texas Office*, 183 F.3d 393.

In an order released on October 8, 1999, the FCC complied with the Fifth Circuit holding by removing intrastate revenues from the contribution base from the schools and libraries and rural healthcare funds.  The FCC made these changes effective November 1, 1999, on a prospective basis.  (Fifth Circuit Remand Order, p. 1 at ¶ 1; see also Doc. 145-8, 2005 Bureau

Order, p. 2, ¶ 3 and p. 5, ¶ 11).

G.     **BellSouth's Petition to the FCC and Motion to Stay the Self Case**

On December 6, 1999, BellSouth, on behalf of itself and its cellular affiliates, including

Cingular, filed a petition with the FCC seeking reconsideration and/or clarification of the FCC

orders concerning cellular cost recovery rules and the FCC's prospective treatment of the

mandate in *Texas Office*.  (Doc. 145-8 (Cingular Ex. 8), 2005 Bureau Order, pp. 2-3, ¶ 5 at n.15).

Concurrently with the petition, BellSouth filed a request for refund of contributions submitted to

USAC for the period January 1, 1998, through October 31, 1999, that was contingent on the

FCC's response to BellSouth's petition.  (2005 Bureau Order, pp. 2-3, ¶ 5 at n.15).

On January 12, 2000, Cingular filed a motion to stay this action with this court.  The basis

of the motion to stay was that the FCC had primary jurisdiction and the court should allow the

FCC to further review and address the retroactivity and recovery issues raised by the *Texas Office*

decision.  On March 6, 2000, the court granted the motion to stay.  (Doc. 75).

H.     **The 2002 FCC Order Discussing Then Current Universal Service Rules and
        Changes to the Rules**

In a 2002 Order, the FCC noted that in the Universal Service Order it had determined that

it would not dictate whether and how much of universal service fund assessments a carrier could

recover from its customers.  The FCC stated that the constraints on carrier recovery were the

requirements of § 254, § 201(a) and § 202(b) of the Communications Act.  (Doc. 145-4 (Cingular

Ex. 4), December 13, 2002 FCC Report and Order, p. 7 at ¶¶ 8-9, p. 24, citing Universal Service

Order, p. 431 at ¶¶ 843-44).

In the same Report and Order, the FCC noted that while it had permitted carriers to

recover their contributions to the universal service fund by a separate line item, which may be expressed either as a flat amount or a percentage (December 13, 2002 FCC Report and Order, p. 28 at ¶ 53; see also 2005 Bureau Order, p. 3, ¶ 7), it was no longer going to allow carriers to include administrative costs and other universal service-related costs in the amount assessed customers, effective April 1, 2003.  (December 13, 2002 FCC Report and Order, pp. 27-28 at ¶¶ 49-53).  This change was made to "address consumer concerns regarding disparate contributor recovery practices."  (*Id*. at ¶ 40).

Noting that "federal universal service line-item charges across industry segments reveal[] that such charges often bear little or no relationship to the amount of the assessment, the FCC determined:

> 49.  Based on our experience over the course of the last three years, we believe it is necessary to provide greater clarity about the practices we deem reasonable to protect consumers.  In light of the changes to the contribution methodology adopted herein, we conclude that the practice of marking up federal universal service line-item charges above the relevant assessment amount will be prohibited prospectively.  We reject proposals to address such practices on a case-by-case basis through enforcement proceedings.  Using our enforcement authority to address such a systemic problem would not be an efficient use of the Commission's resources.  We conclude that a rule of general application will be far mor effective in ensuring that such practices do not occur in the future after we have adjusted our contribution methodology.  Once carriers contributions are assessed on the basis of projected collected interstate and international revenues, carriers may not mark up federal universal service line-item charges above the relevant contribution factor.  This position is supported by the state members of the Joint Board as well as a number of commenter.  Any carrier that applies a federal universal service line-item charge above the relevant assessment amount could be subject enforcement action for violating the rules we adopt herein.

> 50.  The elimination of a mark-ups . . . will also alleviate end-user confusion regarding the universal service line item.  Specifically, the amount of a carrier's federal universal service line item will not exceed the relevant interstate telecommunications portion of the bill times the relevant contribution factor. . . .

19

51.  Therefore, beginning April 1, 2003, carriers that elect to recover their contribution costs through a separate line item may not mark up the line item above the relevant contribution factor.  . . .  Likewise, if a carrier chooses to express its federal universal service line-item charge as a flat amount, that amount may not exceed the interstate telecommunications portion of the bill times the relevant contribution factor.  In addition, we no longer will permit carriers . . . to average contribution costs across all end-user customers when establishing federal universal service line-item amounts. . . .

52.  . . . Accordingly, this requirement will not become effective until April 1, 2003.  We will monitor closely carrier compliance with these new requirements and will take appropriate action if it appears carriers are not complying with our rules.

53.  . . .

54. . . . We acknowledge that contributors may continue to incur some administrative costs associated with the collection of the universal service charges from end users that may not be recovered through a federal universal service line item.  We clarify that we do not believe it appropriate for carriers to characterize these administrative and other costs as regulatory fees or universal service charges after April 1, 2003.  These costs, in our view, are no different than other costs associated with the business of providing telecommunications service and may be recovered through rates or other line item charges.  We conclude it is unreasonable to describe an amount as a universal service regulatory fee when that amount varies from the contribution factor mandated by the regulator.  Carriers, therefore, may not include administrative costs in line items that are characterized as federal universal service contribution recovery charges.  In particular, a carrier may not describe an amount as a regulatory fee relating to universal service when that amount exceeds the contribution factor times the interstate telecommunications revenues on the customer's bill after April 1, 2003.

*Id*., pp. 27-29 at ¶¶ 49-53.  The FCC maintained that carriers could still recover their "legitimate administrative and other related costs" through their rates or through a separate line item (but not the universal service fund assessment line item).  *Id*., p. 29 at ¶ 55.  Additionally, the FCC noted that a wireless carrier could recover its contributions from a customer even if that customer has not made an interexchange call during the billing period.  *Id*., p. 27 at ¶ 51, n.131; *see also* 2005 Bureau Order, p. 4 at ¶ 9.

Noting that AT&T asserted that it may be prevented by existing contracts from recovering its universal service contributions from some certain business customers, the FCC allowed universal service fund contributors to "renegotiate contractual terms that prohibit the pass through of universal service recovery charges."  (December 13, 2002 FCC Report and Order, p. 30 at ¶ 59).

### I.   Plaintiff's Amended Complaint and the 2005 Bureau Order

On September 30, 2004, the court ordered the plaintiff to file her fifth amended complaint by November 1, 2004 (doc. 94), which she did on October 29, 2004 (doc. 95).  In that  amended complaint, the plaintiff made claims for the first time under §§ 201 and 202 of the Communications Act.

On August 22, 2005, the FCC's Wireline Competition Bureau released an Order addressing BellSouth's petition.  (2005 Bureau Order).  In the Bureau Order, the Wireline Competition Bureau clarified that prior rulings and orders of the FCC held that [CMRS] providers may recover their universal service contributions through rates charged for all of their services; and that the FCC applied the *Texas Office* decision prospectively beginning November 1, 1999.  (2005 Bureau Order (Cingular Ex. 8), p. 1 at ¶ 1).  The Bureau Order became final and nonreviewable on October 3, 2006.  *See* 47 C.F.R. §§ 1.106, 1.115-1.117).

The plaintiff has not appeared or intervened in any universal service fee proceeding at the FCC.

### J.   The 2008 FCC Order[6]

On April 11, 2008, the FCC released its Order on Reconsideration (hereinafter "2008

---

[6]The court notes that the 2008 FCC Order is not yet final.  It will become effective thirty days after its publication in the Federal Register.  *See* 2008 Order at ¶ 25.

Order") in which it denied BellSouth's petition for reconsideration with respect to the Fifth

Circuit Remand Order and confirmed the 2005 Bureau Order.  2008 WL 1722044 (FCC).

Specifically, the Commission (1) reaffirmed that CMRS providers may recover their universal

service contributions through rates charged for all of their services; and (2) denied BellSouth's

request for a refund of universal service contributions from January 1, 1998, to October 31, 1999,

that were based on intrastate telecommunications revenues.[7]

In its Order, the FCC noted:

8.      In response to BellSouth's petition requesting clarification of the
Commission's rules, we clarified previously that the *TOPUC* decision did not
undermine the validity of the Commission's decision that CMRS providers may
recover their contributions from customers through rates charged for all services.
The relevant portion of the Fifth Circuit's decision in *TOPUC* related to the
manner in which the Commission may require carriers to contribute to the USF.
The manner in which carriers may recover their universal service contributions
through assessments on customers was not before the court.  Thus, the Bureau
clarified that the *TOPUC* decision did not affect the Commission's finding in the
*Fourth Reconsideration Order* that CMRS providers may "Recover their
contributions through rates charged for all their services."  In fact, the
Commission has made clear that carriers have significant flexibility in the manner
in which they recover universal service contribution costs.  Carriers are not
required to recover their universal service costs from subscribers at all.  If they
choose to do so, carriers may recover these costs through their standard service
charges or through a separate line-item.  We do not alter that conclusion here.

9.      We reiterate that providers that choose to recover their universal
service costs through a separate line-item may express the charge as a flat amount
or as a percentage.  Because, however, of the inherent difficulty in defining and
ascertaining which calls over a mobile wireless system are "interstate," the
Commission has long permitted CMRS providers to assume for purposes of
calculating their USF contributions that a prescribed percentage of their total end
user telecommunications revenues is interstate.  The Commission's rules allow
"wireless telecommunications providers [to] continue to recover contribution
costs in a manner that is consistent with the way in which companies report
revenues to [USAC]" on their USF Worksheets.  Thus, CMRS providers may

---

[7]The Order also dealt with other matters that are not pertinent to this case.  For the purposes of the present motions, the court will
only address the relevant portions of the Order.

include a universal service line-item on a subscriber's bill that does not reflect that particular subscriber's interstate usage.

 . . .

## C.     Retroactive Application of *TOPUC* and the *Fifth Circuit Remand Order*

13.     In the Fifth Circuit Clarification Order, the Bureau clarified that the Fifth Circuit Remand Order applied the Fifth Circuit decision prospectively from the effective date of the Fifth Circuit's mandate.  Upon further consideration, we confirm the conclusion of the Bureau and deny BellSouth's request to apply the Fifth Circuit Remand Order on a retroactive basis. . . .

14.      In considering whether to give retroactive application to a new rule, the courts have held that when there is a "substitution of new law for old law that was reasonably clear," then new rule may justifiably be given solely prospective effect in order to "protect the settled expectations of those who had relied on the preexisting rule."  By contrast, retroactive effect is appropriate for "new applications of [existing] law, clarifications, and additions."  In cases in which there are "new applications of existing law, clarifications, and additions," the courts start with a presumption in favor of retroactivity.  However, retroactivity may be denied "when to apply the new rule to past conduct or to prior events would work a 'manifest injustice.'"  Based on the equitable factors discussed below, we conclude retroactive application would work a manifest injustice that defeats the presumption of retroactivity.  Accordingly, we affirm the *Fifth Circuit Remand Orde*r.

15.     At the outset, we recognize that this case involves conflicting equitable considerations that are somewhat novel. . . . this case does not involve the more common situation that pits one group of carriers against another.  Rather, at its essence, the decision of whether to give retroactive effect to the Fifth Circuit decision requires us to assess the equities of significantly increasing collection from current USF contributors and their customers in order to attempt to flow refunds to millions of customers of an earlier decade.  Thus, this is ultimately a complicated dispute about how to handle a transaction that affects customer groups over different time periods.  In evaluating whether retroactivity would produce a manifest injustice, we focus our analysis on the benefits and burdens to the affected parties.  To do this, we necessarily consider how the refund mechanisms would function and the potential effect of any refund on our statutory obligations under section 254 of the Act.

16.     First, a decision to compel refunds would require USAC to refund to the contributing carriers more than one billion dollars in monies already

23

disbursed to thousands of schools, libraries, and rural health care providers. Because of the resulting shortfall in current USAC funds, USAC would, in turn, have to significantly increase collections from current USF contributors and their customers by raising the contribution factor applied to today's interstate and international revenue.  Indeed, some estimates show that USAC would need to collect an additional $1.6 billion from current contributors, which likely would be passed through by the carriers to today's consumers.  The net effect of any such refund would be that 2008 consumers subsidize charges that should have been paid by consumers in 1998 and 1999 had the Commission assessed only interstate and international revenue (and excluded intrastate revenue).  In our view, such an outcome – higher USF charges to today's customers – would be fundamentally at odds with our Section 254 mandate to preserve and advance universal service. Today's consumers would have to shoulder the burden of the refunds while having no responsibility for causing the underlying problem.  The harms to today's end-users and to the universal service system itself would be undeniable should retroactive effect be given to the Fifth Circuit decision.

17.     Ironically, despite the hardships of a refund on current consumers, those end-users who bore the erroneous costs in 1998-99 would not necessarily reap benefits from refunds.  As a practical matter, because USF contribution charges are generally passed through by the contributing entity to its customers, contributors would have to use the 1998 and 1999 billing information to ensure that the customers who paid the USF received the refunds.  This effort, which would be difficult in even the best of times, is here further complicated because many of the carriers that contributed to the USF based on intrastate and international revenue no longer exist; they would thus be unavailable to receive the refund and disburse it to the appropriate 1998 and 1999 consumers.  Even those carriers who still conduct business may have great difficulties tracking customers from this earlier period, given customer churn.

18.     At the same time, those customers who could be successfully identified would not be assured of obtaining their money from the carriers.  As even BellSouth concedes, attempting to facilitate refunds would be "a bit like unscrambling eggs."  Our rules focus on carrier contributions rather than cost recovery, and the rules afford carriers discretion on how to pass through these cots to their customers.  As a result, with costs passed along in a variety of ways, it would be extraordinarily difficult for the Commission to develop an effective framework for directing carriers' refund efforts.  Moreover, any individual refunds to former customers (to the extent these customers can be identified and located) are likely to be small amounts, which would be further reduced by the offset from increased universal service charges on their current telephone bills.  The only realistic conclusion we can draw is that the potential benefits of refunds for contributors or end-user customers are extremely speculative.

24

19.     In contrast, the costs and burdens of a refund requirement are concrete.  Although the amount of any consumer refund would be minute, the number of customers potentially affected would run into the millions.  As a result, the carriers' administrative costs might be passed along to end-users through other increased charges.  Further, the likelihood for significant confusion in administering any refund program has been repeatedly recognized by commenters.  The anticipated confusion would, in turn, impinge on the Commission's obligation to ensure the "sufficiency" of the USF based on "equitable" contributions.  In our view, imposing an unworkable refund obligation for only the most speculative of benefits does not serve the public interest or comport with our statutory obligations under section 254.

20.     We conclude that considerations of fairness and equity militate strongly against retroactive application and defeat the presumption of retroactivity.  Requiring refunds of this magnitude would compel USAC to raise the USF contribution factor.  That would cause manifest injustice for today's consumers, as they shoulder higher bills while bearing no culpability for the refund problem.  At the same time, we strongly doubt it would be possible to ensure that the refunds provided by USAC be passed through appropriately to end-users.  Moreover, any customers who received a small refund check would benefit little because they, too, would be saddled with higher USF charges going forward.  In contrast, some carriers could conceivably obtain windfalls where payments are not flowed through to their former customers.  Neither logic nor fairness supports such a result, which works a "manifest injustice" not only upon current end-users, but upon the Universal Service program as a whole.  Under these circumstances, we decline to order retroactive application of the Fifth Circuit's decision.

## IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided by trial.  Only when that burden has been met does the

burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of her case on which she bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23; *see* Fed. R. Civ. P. 56(a) and (b). Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id*.

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## V.    DISCUSSION

### A.    Overview

In the present action, the plaintiff presents state law breach of contract, unjust enrichment, misrepresentation and suppression, and conspiracy claims (Counts One, Three, Four and Five) and a claim for violations of §§ 201(b) and 202(a) of the Federal Communications Act (Count Two).[8]  This court has previously held that many of the issues raised by the plaintiff "were appropriately left for resolution by the FCC, which possesses much greater experience in the area of the universal service program."  (Doc. 74 at p. 7).  After having stayed the case to afford the defendants an opportunity to seek clarification from the FCC regarding retroactive application of the *Texas Office* decision, the matter is again before this court.

The plaintiff's motion principally seeks to have this court declare that it has jurisdiction over all her claims.  (Doc. 137).  In contrast, the defendants' motion asserts that this court lacks jurisdiction over various claims and/or that they are preempted from review.  (Doc. 138).  To properly assess the motions, it is necessary to set out the applicable statutory framework.

Where the FCC orders, permits, or directives require a carrier to take certain action or prohibit a carrier from doing something, the carrier's action or actions must be "just and reasonable."  *See* 47 U.S.C. § 201(b) ("all charges, practices, classifications, and regulations for and in connection with such communication service shall be just and reasonable, and any such charge, practice, classification or regulation that is unjust or unreasonable is hereby declared to be unlawful").  Similarly, any actions by the carrier must be equitable and nondiscriminatory. *See* 47 U.S.C. § 202(a) (it is "unlawful for any common carrier to make any unjust or

---

[8] 47 U.S.C. §§ 201(b) and 202(a).

unreasonable discrimination in charges, practices, classifications, regulations, facilities or services").

A complainant may bring a cause of action against any carrier he or she believes is acting in a prohibited or unlawful manner under the FCA.  47 U.S.C. § 206.  Such an action may be initiated by either making a complaint to the FCC or by bringing a suit for the recovery of damages against the carrier "in any district court of the United States of competent jurisdiction." 47 U.S.C. § 207.  The Act also provides that nothing therein is intended to "abridge or alter the remedies now existing at common law or by statute, but the provisions of this [Act] are in addition to such remedies."  47 U.S.C. § 414.

### B.      The Plaintiff's Claims

The plaintiff asserts that the FCA requires the defendants to furnish their services in accordance with the orders of the FCC in an "equitable, non-discriminatory" manner that does not "shift more than an equitable share of [the] contributions to any customer or group of customers."  (Doc. 141 at p. 8 (citing 47 U.S.C. § 201(a), 13 F.C.C.R. 5317, ¶¶ 829 (1979), and 17 F.C.C.R. 3752, 3735 (2002)).  She further asserts that Cingular failed to do that "in the method and manner it allocat[ed] its USF contribution recovery from [its] customers," which gives rise to this court's jurisdiction.  *Id*. at p. 10.  Still further, she asserts that the circuit court of appeals lacks jurisdiction over her claims because her "claims do not conflict with nor attempt to enjoin, set aside, suspend, or determine the validity of any FCC order."  *Id*. at pp. 10-11.

More specifically, the plaintiff asserts that this court's original jurisdiction is premised on the fact that the defendants improperly based their USF contributions, in part, on intrastate revenues.  The plaintiff states that the method used by the defendants was unjust and

28

unreasonable under the FCA. *Id.* at p. 13. This contention rests on the holding in *Texas Office* that the assessment of USF charges on intrastate revenues is unconstitutional. *Id.* As a remedy, she seeks a refund in the amount collected by Cingular that was unlawfully calculated on intrastate revenues. *Id.* at p. 14. She also contends that Cingular violated the FCA in its "inequitable allocation of USF assessments" as a "flat rate...on a per line basis thereby causing those customers with less telephone usage to assume a higher percentage of USF charges thereby benefitting high volume users." *Id.* at p. 14.

### C.      Analysis

#### 1.      Jurisdiction of Any FCA Claim – Generally

The initial question is whether the plaintiff properly has presented an FCA claim in this judicial action.[9] She asserts that she did because § 207 creates original jurisdiction in this court as a result of the removal of the case from State court. *Id.* at p. 15. She further argues that because her claims do not attempt to enjoin, set aside, suspend, or determine the validity of any final order of the FCC, there is no exclusive jurisdiction with the appellate courts. *Id.* She cites *Field Container Corp. v. ICC*, 712 F.2d 253 (7th Cir. 1983), in support of her contention. *Id.* at 16. The defendants counter that to the extent that the plaintiff's claims concern the *Texas Office*

---

[9]In Count Two of her complaint, the plaintiff alleges:

> 27.  The aforesaid actions and activities of defendants constitute unjust and unreasonable charges, practices, and classifications in violation of 47 U.S.C. § 201(b); unjust, unreasonable discrimination in charges, practices, classifications, and services to customers by charging inequitable amounts of Universal Service Fund charges through the use of a flat rate charge to plaintiff and other class members or by otherwise assessing charges on an inequitable basis in violation of 47 U.S.C. § 202(a); the giving of undue or unreasonable preference or advantage to particular persons or class of persons through the imposition of Universal Service Fund charges to the detriment of plaintiff and the other class members in violation of 47 U.S.C. § 202(a); violated policies mandated by the FCC that carriers not shift more than an equitable share of contributions to the Universal Service Fund to any customer or group of customers; and failing to provide adequate, truthful, and complete information regarding the nature of the Universal Service Fund charges to the detriment of plaintiff and other class members.

(Doc. 95 at pp. 12-13).

remand order (Fifth Circuit Remand Order) issued by the FCC, they cannot be brought in this court.  (Doc. 147 at p. 10).  The defendants further assert that the plaintiff's reliance on *Field Container* is misplaced.  *Id*. at p. 11.

The courts of appeals have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47."  28 U.S.C. § 2342(1).  The relevant question in this instance is whether the plaintiff's claims for relief require this court to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of " any FCC final order.  *Id*. Contrary to the plaintiff's assertion that her claims do not require such action, the court finds that in order to adjudicate certain aspects of the plaintiff's claims it is necessary to determine, in part, the validity of certain actions of the FCC.  This, however, is committed to the jurisdiction of the courts of appeals, not this court.  Accordingly, her motion is due to be denied in part and granted in part.

To the extent that the plaintiff argues that Congress has provided "an alternative forum" for review of her FCC claim concerning the validity of the Universal Service Order, particularly the retroactive application of *Texas Office*, the court disagrees because of the circumstances before it.  Similarly, to the extent she relies on *Field* in support of this contention, the court finds otherwise.  As noted by the defendants, *Field* is inapposite.  It involves a completely different statutory scheme than that presented in this action.  *Field*, 712 F.2d 250 (petition to set aside a decision of the Interstate Commerce Commission).

To the extent that the plaintiff argues that she is not challenging an FCC order, but is challenging Cingular's failure to comply with the same, the undersigned finds that this does not

create jurisdiction in the present situation. *Id*. at pp. 16-17. *Texas Office* made it clear that the FCC could not assess intrastate revenues of service providers to determine universal service contributions. *Id*., 183 F.3d at 446-48. The FCC, in the Fifth Circuit Remand Order, then prospectively eliminated the assessment of universal fee contributions on intrastate revenues. It also later clarified that the FCC's changes would be prospective effective November 1, 1999, and that CMRS providers, such as the defendants, could recover their universal service contributions through rates charged for all their services. (Fifth Circuit Remand Order and 2005 Bureau Order).

No authority has held that *Texas Office* is to be applied retroactively. In fact, the 2008 Order expressly finds otherwise. This court does not possess the jurisdictional authority to so find and order. Despite the plaintiff's contentions to the contrary, the applicable law is clear, "All orders of the Commission...shall continue in force for the period of time specified in the order or until the Commission or a court of competent jurisdiction issues a superseding order." 47 U.S.C. § 408. *Texas Office* and the Fifth Circuit Remand Oder supersede the FCC's Universal Service Order, but only in part. They do not provide this court with jurisdiction to consider the plaintiff's claims to the extent that they seek retroactive application of the *Texas Office* holding to the universal service fees collected prior to November 1, 1999, especially in light of the 2008 Order. To the contrary, the court specifically finds otherwise.

In her reply to the defendants' response to her motion for partial summary judgment, the plaintiff argues that her claims do not conflict with the FCC remand order because "[r]etroactive or prospective implementation of the Fifth Circuit's order by the FCC has nothing to do with Self's request for remedial restitution of amounts unlawfully assessed prior to the effective date

31

of the Fifth Circuit's order."  (Doc. 153 at pp. 2-3 (footnote omitted)).  This court disagrees.

Many parts of the plaintiff's FCA claim have much to do with the remand order as already

discussed.[10]  Accordingly, the court finds that it is without jurisdiction to hear any aspect of her

claim that is premised upon retroactive application of *Texas Office* or a challenge to the FCC's

orders (*e.g.*, the Universal Service Order, the Fourth Order on Reconsideration, the Fifth Circuit

Remand Order, the 2005 Bureau Order, or the 2008 Order).

> The plaintiff' FCA claim also asserts as follows:
>
> §§ 201 and 202 were violated by Cingular through its inequitable allocation of
> USF assessments recovered from its customers.  Although Cingular was not
> required by the FCC to recoup the amounts of USF contributions assessed by the
> USCA from its customers, FCC regulations did require that no customer or group
> of customers bear an inequitable share of Cingular's USF contribution.  In
> addition, under sections 201 and 202 of the FCA and FCC orders, Cingular's
> method chosen to recoup its USF contributions was required to be just and
> reasonable.  Self contends that Cingular's practices in allocating USF
> contributions to its customers imposed an inequitable, unjust and unreasonable
> share of its USF contributions to certain groups of customers when it assessed a
> flat rate for USF contributions on a per line basis thereby causing those customers
> with less telephone usage to assume a higher percentage of USF charges thereby
> benefiting high volume users.

(Doc. 141 at p. 14).  The defendants counter that they were allowed by the FCC to make

"flat-rate" assessments and that they are a commonly accepted practice.  (Doc. 147 at p. 20).  It

further argues that for the plaintiff to prevail on this claim, the court would have to overturn

numerous FCC orders.  *Id*.  Thus, Cingular argues the FCA claim regarding this practice is due to

be dismissed.[11]  In her reply, the plaintiff states:

_____

[10]The plaintiff also argues that because "the FCC has issued no ruling on Cingular's request for a refund...there is no order
conflicting with Self's claims."  (Doc. 153 at p. 3).  As of April 11, 2008, this is no longer true.  The FCC has now ruled and has
expressly declined to apply *Texas Office* retroactively.

[11]Cingular similarly argues that the state law claims to the extent they challenge the flat rate assessment method are preempted.
*Id*.

Self does not contend that Cingular was prohibited from imposing a line item charge in any form.  Self does contend that the line item charge chosen by Cingular bore no relationship to the amount of interstate telephone usage, thereby making the charge inequitable as to certain customers under § 201 and 202 of the Act.  Until 2002, the FCC had no rule or regulation regarding the amount of the line item charges other than that they be fair and equitable.  In 2002, the FCC regulated these line items by passing regulations attempting to eliminate the disparity between individual customers' USF contributions by tying the amount of the USF charge more closely to the percentage of interstate telephone usage.... There is no conflict.

(Doc. 153 at p. 6 (reference omitted)).

The court finds a distinction between the plaintiff's claims regarding intrastate rates and her claims regarding use of the "flat rate, line item" charge.  Specifically, the court finds that the claims regarding intrastate rates do not hinge on reasonableness, whereas the claims regarding the flat rate, line item charges do, as specified in the December 13, 2002 order.  The FCC's rules regarding the use of the flat rate line item are more vague than those allowing assessment based on intrastate rates, which requires the court to consider the reasonableness of the costs associated with the billed-for fees.

Until the December 13, 2002 order, the FCC had ruled that carriers could recover their costs so long as they did not shift more than an equitable share of their contributions to any customer or group of customers.  (*Universal Service Order*, p. 424 at ¶ 829).  In the December 13, 2002, the FCC clarified what it found to be reasonable and just to be effective prospectively, beginning April 1, 2003.  Therefore, to the extent that this aspect of the FCA claim (regarding the "line item, flat rate charge") is based on a challenge to any FCC order allowing such a charge, this court is without jurisdiction.  To the extent that this claim is based on the theory that the defendants collected more than they were authorized, the motion is granted in part.  Specifically,

to the extent the plaintiff alleges that the defendants collected unrelated costs or fees or costs and fees not in connection with the universal service charge, the claim is allowed as the plaintiff alleges that those unrelated costs and fees were unjust and unreasonable.

In sum, to the extent that the plaintiff's FCA claim is premised on the universal service charge to the customer being assessed on the basis of intrastate revenues (see the Amended Complaint (doc. 95) at ¶ 10), the claim is precluded.  To the extent that the claim seeks to challenge the use of a "line item, flat rate" charge authorized by the FCC orders, the claim is precluded as the evidentiary submissions before the court demonstrate that the FCC has authorized and approved such charges.[12]  (December 13, 2002 FCC Report and Order, p. 28 at ¶ 53;[13] 2005 Bureau Order, p. 3 at ¶ 7).  To the extent that the plaintiff asserts claims of unjust and unreasonable charges under § 201(b) (*e.g.*, collecting more than was authorized, using a greater factor than allowed by the FCC), the court does have jurisdiction to entertain the same.

### 2.    Application of Section 2342

The plaintiff also argues that the jurisdictional restrictions of 28 U.S.C. § 2342[14] are not applicable because she does not challenge the validity of the original Universal Service Order that was issued by the FCC because that order "has <u>already</u> been successfully challenged by carriers and overturned by the Fifth Circuit Court of Appeals."  (Doc. 141 at p. 22).  According to

---

[12]It is not in dispute that the FCC in allowing a "flat rate, line item" charge must have realized that certain customers or groups of customers would pay more considering their usage than others.

[13]The 2002 Order states that "carries will have the flexibility to express the line item either as a flat amount or as a percentage, as long as the line item does not exceed the interstate telecommunications portion of a customer's bill times the relevant contribution factor."  *Id*. at ¶ 53.

[14]Section 2342 provides, "The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47 [(judicial review of commission orders and decisions)]."  28 U.S.C. § 2342(1).

the plaintiff, she is seeking a "remedy," that is, she is "simply seek[ing] refunds of those monies obtained through assessments held in [*Texas Office*] to have been unlawful." *Id.* For the reasons just discussed, the court disagrees with the plaintiff's contention. In sum, the court does not find that the *Texas Office* decision creates jurisdiction in this court concerning the recovery of any universal service fees collected from the plaintiff (or other putative class members) between about January 1998 and October 31, 1999. To afford the plaintiff the relief she seeks, this court would have to afford her more than a remedy, it would have to extend the holding in *Texas Office* or the FCC order in the Fifth Circuit Remand Order and countermand the 2008 Order.

**3.    The Universal Service Order is Void *ab Initio***

The plaintiff argues that the holding in *Texas Office* means that the Universal Service Order permitting USF assessments on intrastate revenues was void *ab initio*. (Doc. 141 at p. 34). The defendants disagree, contending that under 47 U.S.C. § 408, "[a]ll orders of the Commission...shall continue in force for the period of time specified in the order until the Commission or a court of competent jurisdiction issues a superseding order." (Doc. 147 at p. 12). Although the plaintiff's argument is interesting, it does not create jurisdiction in this court.

In *Legal Environmental Assoc. Foundation, Inc. v. E.P.A.*, 118 F.3d 1467, 1473 (11th Cir. 1997), the Eleventh Circuit stated as follows:

As the Supreme Court has admonished:

"The power of an administrative [agency] to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law ... but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity."

35

> *Dixon v. United States*, 381 U.S. 68, 74, 85 S. Ct. 1301, 1305, 14 L. Ed. 2d 223
> (1965) (quoting *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134,
> 56 S. Ct. 397, 400, 80 L. Ed. 528 (1936)); *see also United States v. Larionoff*, 431
> U.S. 864, 873, 97 S. Ct. 2150, 2156, 53 L. Ed. 2d 48 (1977) ("[R]egulations, in
> order to be valid must be consistent with the statute under which they are
> promulgated."). Therefore, if the UIC regulations are inconsistent with the
> statute, as LEAF contends, these regulations are void *ab initio* and cannot be
> relied upon by EPA to deny LEAF's petition for withdrawal of the Alabama
> program.

Even if the plaintiff is correct and the order to assess USF contributions on intrastate revenues is

void *ab initio*, this court is without jurisdiction to make that determination.  To do so in the

present circumstances would exceed this court's authority.  That is a matter within the authority

and jurisdiction of the FCC and the court of appeals under § 2342(1).[15]

### 4.    There is No Order Because Cingular's Actions Were Voluntary

The plaintiff also asserts that there is no "order" of the FCC to challenge.  (Doc. 141 at p.

27).  More particularly, the plaintiff asserts that there is no "order" because Cingular's "recovery

of USF assessments was voluntary."  *Id*. at p. 28.  In sum, the plaintiff asserts that since there was

no "command" in the Universal Service Order, as that term is defined by *Webster's New*

*Collegiate Dictionary*, there is no final "order of the FCC implicating § 2343 jurisdiction."  *Id*.

The plaintiff principally relies on the holding of *RCA Global Communications, Inc. v. Western*

*Union*, 521 F. Supp. 998 (S.D.N.Y. 1981), in support of this contention.  The defendants state

that *RCA Global* is distinguishable (doc. 147 at pp. 13-16) and that there is in fact an "order" of

the FCC (*id*. at pp. 31-34).

The plaintiff's first contention, that there is no order, misses the mark.  When the FCC

---

[15]With regard to the plaintiff's further assertion that "there is no legal order of the FCC and nothing for a circuit court of appeal[s] to consider," this court disagrees.  (Doc. 141 at p. 35).  This is particularly true in view of  § 408's direction concerning the continued force and effect of an FCC order.  47 U.S.C. § 408.

released the May 8, 1997 *Universal Service Report and Order* (the Universal Service Order), it established and implemented the ongoing universal service support system.  (Fourth Order on Reconsideration (Doc. 145-7 (Cingular Ex. 7), p. 4 at ¶ 1)).  It was a comprehensive endeavor that included provisions for funding the program through assessments on interstate and intrastate revenues.  As noted in the Fourth Order on Reconsideration, "In the [May 8, 1997] *Order*, the Commission determined to continue its historical practice of permitting carriers to recover the amount of their contributions to the federal universal service support mechanisms through rates for interstate services only."  *Id*. at p. 168, ¶ 306.[16]  It was in this order (the Fourth Order on Reconsideration) that the FCC held that it would "permit CMRS providers to recover their contributions through rates charged for all their services."  *Id*., p. 170 at ¶ 309.  Although the language concerning recovery of these assessments was voluntary or permissive, that does not change the fact that the authority to collect them is part of FCC orders.  Additionally, because it (the recovery of the assessments) is a part of various FCC orders, the defendants are subject to the "just" and "reasonable" requirements of 47 U.S.C. ¶¶ 201(b) & 202(a).  Accordingly, the court finds that the various provisions of the Universal Service Order and the Fourth Order on Reconsideration that are applicable to this matter are "orders" for purposes of this proceeding.

The court's holding in *RCA Global* is factually distinguishable and not dispositive of the present issue.  In that matter, RCA Global sued Western Union (hereinafter "WU") for damages premised on WU's offering of international telephone service in violation of the Communications Act and an earlier decision of the Second Circuit Court of Appeals[17]

---

[16]It was in this order that the FCC held that it would "permit CMRS providers to recover their contributions through rates charged for all their services."  *Id*., p. 170 at ¶ 309.

[17]*Western Union International, Inc. v. Federal Communications Commission*, 544 F.2d 87, 92 (2d Cir. 1976), *cert. denied*, *Western Union Tel. Co. v. Western Union Intern. Inc*., 434 U.S. 903, 98 S. Ct. 299, 54 L. Ed. 2d 189 (1977).

(hereinafter "Mailgram"), and without appropriate FCC approval.  When WU's offering of this international teletype service was before the FCC after Mailgram, the Commission held the offered service did not violate the Act so long as WU filed a tariff for the same.  *RCA Global*, 521 F. Supp. at 1000.  On appeal of the FCC decision to the Second Circuit Court of Appeals, the court "rejected the FCC's analysis" and held that WU's international service violated the Act.  *Id*. at 1001.  In so finding, the Second Circuit "rebuked the FCC for 'the Commission's defiance of Mailgram' and stated that WU's 'conduct of international telegraph operations...clearly violates § 222 of the Act and cannot lawfully be authorized by the FCC....'"  *Id*. (citation omitted).

Western Union moved to dismiss the district court action for damages premised, *inter alia*, on the contention that when it was before the FCC, the Commission found that WU could lawfully provide international service if it filed a tariff.  *Id*.  It further argued that "under the provisions of § 408 of the Communications Act, FCC orders 'shall continue in force...unless... suspended or modified or set aside by the Commission or...by a court of competent jurisdiction.' 47 U.S.C. § 408."  *Id*. at 1001.  RCA Global argued that the FCC's unauthorized approval of WU's conduct cannot serve to immunize WU from liability.  *Id*.  "In addition, [RCA Global] emphasize[d] that this [was] not a case in which liability is premised upon conduct which a private party was ordered to undertake by a government agency, since the FCC did not order WU to undertake overseas service but merely construed the Communications Act not to forbid it."  *Id*.

In rejecting these arguments, the district court stated:

> ....  It follows that, by entering the overseas telecommunications market, WU embarked on a course of conduct "prohibited or declared to be unlawful" by the Communications Act, and it is "liable to the person or persons injured thereby ..."  47 U.S.C. § 206.

We need not determine whether the FCC's approval of [this international service] might carry weight if the FCC had been delegated authority to determine which operations would be permissible and which would be prohibited for communications carriers.  With respect to merged telecommunications carriers, the FCC never possessed such authority.  The Act itself limits merged carriers to the domestic market.  In these circumstances, the FCC acted in an adjudicatory rather than a rulemaking role which it construed the Communications Act to permit [this service].  By providing for judicial review, however, Congress intended that the courts, rather than the FCC, should have the final say on the interpretation of the Act.

Nor are we persuaded by WU's argument that the FCC order served to immunize it from liability for its overseas service by virtue of § 408 of the Act, which provides that FCC orders "shall continue in force ... unless ... suspended or modified or set aside by the Commission or ... by a court of competent jurisdiction."  47 U.S.C. § 408.  Section 408 appears to be directed to orders which require affirmative action to be taken by a party.  The "order" at issue here did not, however, require WU to establish or continue to operate its overseas service.  Instead, it merely interpreted the Communications Act not to forbid such operations.  There is no question here of WU having been forced, by the authority of the FCC, to "comply" with an FCC order which remained in force until vacated under § 408.  Moreover, § 408 does not purport to immunize from future damage actions conduct taken in compliance with an FCC order.  Whatever bearing § 408 may have where a party is sued for actions taken in accordance with an affirmative FCC order, this is not such a case.  Accordingly, we hold that the unauthorized and erroneous FCC decision that [this international service] did not violate the Communications Act does not prevent WU from being held liable for its illegal conduct.

We do not agree with WU that such a holding serves to undermine the FCC's regulatory authority.  As the Court of Appeals made abundantly clear in both the *Mailgram* and *ITT World Communications* cases, the FCC simply had no authority to authorize WU to engage in international telecommunications operations.  Entertaining a private damage action based on conduct which the FCC had no authority to approve does not, therefore, interfere with the agency's legitimate administration of the Communications Act.  To the contrary, such a suit serves to ensure that "the Commission's defiance of *Mailgram* " is not granted legal validity.

*Id*. at 1003-04.

The holding in *Texas Office*, declaring the assessment on intrastate revenues

unconstitutional, post-dated the period of recovery sought by the plaintiff in this action.  The

assessment in question, unlike the actions in *RCA Global*, was not contrary to express language

of the Act or a prior decision of a court of appeals.  Additionally, unlike the proceeding in *RCA*

*Global*, to permit this portion of the plaintiff's FCA claim to go forward, the court would have to

exceed its jurisdictional mandate since neither the FCC nor any appellate court has declared that

*Texas Office* is to be given retroactive effect, and, in fact, has ruled to the contrary in the 2008

Order.  In *RCA Global*, the district court was merely providing a vehicle for the recovery of

damages under § 206 for conduct that had been declared prohibited.  Thus, *RCA Global* does not

assist the plaintiff in advancing her claims to the extent she relies on *Texas Office's* holding.

### 5.    Cingular's Voluntary Action

The plaintiff also argues that the defendants can be held accountable on the assessment

related claims because Cingular acted at its peril in "choosing to recover its USF assessments

from its customers and recovering contributions from all of its revenues" in light of the fact that

numerous carriers had challenged the legality of the assessment in *Texas Office*.  (Doc. 141 at pp.

32-34).  The plaintiff concludes that because the defendants acted in the absence of any

"command, mandate, or order of the FCC," "no jurisdiction is conferred on a court of appeals

under 28 U.S.C. § 2342."  *Id*. at p. 33.  The defendants counter:

> The "voluntary" nature of the decision to recover contributions has no
> bearing on either jurisdiction or preemption.  The FCC let carriers decide whether
> to recover their contributions, but for carriers electing to recover, the FCC
> regulated the recovery process.  The fact that the FCC gave carriers the option of
> recovering their contributions is not material in light of the fact that the FCC
> further ruled that if carriers recovered their contributions, they must do so in a
> certain prescribed way.  Carrier recovery is a fundamental part of the universal
> service program.  Self is suing Cingular over how it carried out the recovery, and
> her claims go directly to the heart of the FCC's recovery rules.

(Doc. 147 at pp. 8-9).

The fact that Cingular recovered a portion of the assessment paid premised on intrastate revenues from the plaintiff and others during the pendency of *Texas Office* does not confer jurisdiction on this court to hear the FCA involved assessment claims. That the act of collecting the fee may have been discretionary does not change the fact that the right to do so is derived from an order of the FCC as already discussed. Similarly, as noted by the defendants, the FCC regulated the recovery process. Accordingly, the plaintiff's assertions are insufficient to support her jurisdictional claim.

### 6.    Self is Not a "Party" to Any FCC Proceeding

The plaintiff next asserts that "[t]o the extent that [her] claims touch upon any FCC order because Self was not a 'party' to any FCC proceeding resulting in issuance of any order and only parties to a proceeding may invoke the jurisdiction of the court of appeals under § 28 U.S.C. 2342 [sic], there is no order for the FCC 'made reviewable by § 402(a).'" (Doc. 141 at p. 36). She also argues that if her claims are "found to be subject to the jurisdiction of the court of appeals, Self would be left without a remedy in that [she] would be unable to invoke the jurisdiction of the court of appeals by filing a petition therein because she was not a 'party' to any FCC proceeding related to issuance of the order." *Id*. at p. 37. She further concludes that she "must be provided a remedy to recover those fees obtained wrongfully by Cingular. If Cingular's contention that Self's only remedy is appeal to a circuit court of appeals were correct, Self and the class members would be left without a remedy if they are unable to invoke the jurisdiction of the court of appeals." *Id*.

The defendants retort that the plaintiff has waived all of her opportunities to appear

41

before the FCC concerning prospective application of the *Texas Office* decision in the FCC's

Fifth Circuit Remand Order.  (Doc. 147 at p. 19).  Specifically, the defendants argue that she

could have (1) filed a petition before the FCC seeking review or reconsideration for the order

pursuant to 47 U.S.C. § 405,[18] (2) filed a comment during the comment cycle on BellSouth's

petition concerning retroactive application, and (3) filed a petition for reconsideration or an

application for review of the FCC's August 2005 Bureau Order on BellSouth's petition pursuant

to § 405 and the FCC's rules.  *Id.*

Under § 405, the plaintiff had the opportunity and right to petition for reconsideration of

any order, decision, report, or action of the FCC, including the orders holding that *Texas Office*

should be given prospective application and that the FCC would later address the defendants'

petition regarding a refund for the fees assessed prior to November 1, 1999.  47 U.S.C. § 405(a).

Any petition had to be filed within thirty days of the action complained about.  *Id.*  Because the

plaintiff did not petition for reconsideration of any of the relevant FCC orders in this case, she

can not now use that failure as a basis for creating jurisdiction for advancement of her current

claims.  To the contrary, the court finds that this argument is insufficient to convey jurisdiction.

In her reply brief, the plaintiff argues that she has not bypassed any opportunities before

the FCC.  She further states that the defendants "initiated the issue of 'prospective application' in

[their] petition to the FCC as a result of Self's claims" and that her lawsuit was filed before the

---

[18]Section 405(a) provides in pertinent part:

> After an order, decision, report, or action has been made or taken in any proceeding by the
> Commission, or by any designated authority within the Commission pursuant to a delegation under section
> 155(c)(1) of this title, any party thereto, or any other person aggrieved or whose interests are adversely
> affected thereby, may petition for reconsideration only to the authority making or taking the order, decision,
> report, or action....   A petition for reconsideration must be filed within thirty days from the date upon which
> public notice is given of the order, decision, report, or action complained of....

47 U.S.C. § 405(a).

defendants' petition.  (Doc. 153 at pp. 4-5).  Accordingly, she argues:

> Under 47 U.S.C. § 207, if Self could and chose to make a complaint to the FCC as opposed to continuing her suit for recovery of damages in the district court, she would have foregone her ability to pursue her original relief in this court as permitted by § 207 in that a 'person shall not have the right to pursue both such remedies.'  The same result would occur if Self submitted comments in response to the FCC's request.

*Id*.

The plaintiff offers no authority convincing the court that if she had petitioned for reconsideration as an interested or otherwise affected party, she would have been precluded under § 207 from her remedy in this court.  To the contrary, such action may have precipitated disposition of this matter by encouraging the FCC to address the issue of retroactive application of the holding in *Texas Office* earlier.

### 7.     No Challenge to the FCC's Fourth Order

The plaintiff next contends that this court has jurisdiction to hear her FCA (and state law) claims as they do not challenge the FCC's Fourth Order because they only concern recovery of USF contributions "through a fee separate from and in addition to its rates charged for its services.  Self's claims do not involve or challenge the 'entry of' or 'rates charged' by CMRS carriers, but rather, other terms and conditions of CMRS services.  Therefore, neither § 332(c)(3)(A) nor the FCC's Fourth Order apply to Self's [c]laims."  (Doc. 141, at p. 41).

Section 332(c)(3)(A) of the Communications Act provides that states may not "regulate the entry of or the rates charged by any [cellular provider]…except that this paragraph shall not prohibit a State from regulating the other terms and conditions of [cellular service]."  47 U.S.C. § 332(c)(3)(A).  That section does not alter the regulatory authority of the FCC over cellular

carriers under § 201 and § 202 of the Communications Act.  To the contrary, Congress prohibited the FCC from making § 201 and § 202 inapplicable to cellular carriers in § 332(c)(1)(A).  *See generally* Cingular's Ex. 10, Wireless Forbearance Order, p. 9 at § 15 (discussing continued applicability of § 201 and § 202 to CMRS providers).  Additionally, the Eleventh Circuit Court of Appeals has held that the FCC's authority "to regulate federal universal service contributions derives from section 254(d) of the Communications Act, not section 332(c)(3)(A)."  *National Association of State Utility Consumer Advocates v. Federal Communications Commission*, 457 F.3d 1238, 1256 (11th Cir. 2006).  Accordingly, it is § 254 and not 332(c)(3)(A) that must be considered for jurisdictional purposes in the present matter.

The plaintiff argues that *Texas Office* and *Sprint Spectrum v. State Corp. Com'n of Kansas*, 149 F.3d 1058 (10th Cir. 1998), support her argument that federal or state requirements regarding USF contributions and recovery by CMRS carriers do not constitute the regulation of rates and entry under § 332(c)(3)(A).  (Doc. 141 at p. 41).  She further states that these courts held that "allowing states to require USF contributions from CMRS is not the regulation of rates or entry, but rather, constituted 'other terms and conditions' of service of CMRS carriers which were subject to state regulation."  *Id*. (citing *Texas Office*, 138 F.3d at 432; *Sprint Spectrum*, 149 F.3d at 1062).  Accordingly, she argues that this court may consider her present claims as they do not involve the regulation of rates or entry.

The defendants counter that "[t]he issue in those cases was whether or not a state universal service fund requirement violated the prohibition in § 332(c)(3)(A) on states regulating the rates of wireless carriers."  (Doc. 147 at p. 29).  Cingular goes on to argue:

The courts in both cases concluded that such regulation was not rate regulation.

44

> Those conclusions have no bearing on the issue before this Court....  The one principle in both cases that does bear on the issues before this Court, however, is that when construing claims relating to the universal service program, the inquiry focuses on the relevant provisions of § 254 even when the carrier involved is a cellular carrier.

*Id*.

This court finds §§ 201(b), 202(a), and 254(d) provide the relevant jurisdictional framework for this case concerning universal service contributions.  Section 332(c)(3)(A) does not provide a jurisdictional basis for consideration of the plaintiff's claims.  This holding is consistent with the expressed intent of Congress and the FCC.  In § 332(c)(1)(A), Congress allowed the FCC to forebear regulation of wireless carriers under some provisions of the FCA.  Specifically, in pertinent part, Congress prohibited FCC forbearance in wireless carrier matters under §§ 201, 202 & 208.  47 U.S.C. § 332(c)(1)(A).  Since its passage in 1996, Congress has provided in 47 U.S.C. § 160(a) that the FCC could forebear any FCC regulation or other provision of the Act, including §§ 201, 202 & 208, provided certain requirements were met.  The FCC has stated that it would be "a particularly momentous step" for the Commission to forbear enforcement of  §§ 201 & 202.[19]  (Doc. 145-10, Cingular's Ex. 10, Wireless Forbearance Order, p. 9 at ¶ 15 (footnotes omitted)).

Self's contentions that her claims do not challenge the FCC's Fourth Order and are not the regulation of "rates" or "entry" under § 332(c)(3)(A) because Cingular passed the universal

---

[19]In discussing its reasons for denial of forbearance, the FCC stated:

> In addition, if we were to forbear from enforcing sections 201 and 202, parties would likely turn to the courts for relief from perceived unjust and unreasonable carrier practices.  We believe that since the courts lack the Commission's expertise, developed over decades, in evaluating carriers' practices, carriers would face inconsistent court decisions and incur unnecessary costs.  This could result in consumers receiving differing levels of service and protection depending upon the jurisdiction in which they live, contrary to the intent of Congress in amending section 332(c).

(Cingular's Ex. 10, Wireless Forbearance Order, pp. 15-16, ¶ 30 (footnotes omitted)).

service charge through a "line item, flat rate" are unpersuasive.  Self attempts to circumvent the

need to address the retroactive application of *Texas Office* to the assessment of the universal

service fee on intrastate revenues by arguing that the defendants sought to recover their

contributions through a "line item, flat rate" charge; however, that does not change the true

nature of this action as it relates to the FCA and this court's jurisdiction.  Accordingly, the court

again finds that it does not have jurisdiction of the plaintiff's FCA based claims to the extent they

require a finding that the collection of the universal service fee before November 1, 1999, was

unconstitutional or that *Texas Office* should be given retroactive application in the present

instance or to the extent that the plaintiff challenges the defendants' use of a "line item, flat rate"

charge in a purportedly discriminatory manner.

### 8.    Jurisdiction on the Plaintiff's State Law Claims[20]

### a.    Contract Claims

Apart from her jurisdictional assertions regarding the FCA claims (Count Two), the

plaintiff also argues that the court has jurisdiction over her contract claims because they do not

implicate any order of the FCC.  (Doc. 141 at p. 18).  Her contract claims are premised on two

general contentions: (1) "Cingular charged and collected monies from its customers for

reimbursement of its contributions to the USF when no provision in its contracts with its

customers allowed such assessment, and (2) [Cingular] charged and collected monies for USF

contributions in excess of the amount permitted in some contracts during certain periods wherein

Cingular and its customers agreed that Cingular could charge for reimbursement of contributions

and costs associated with the USF program."  *Id*.  Additionally, she argues that Cingular

---

[20]The defendants address the plaintiff's state law claims in detail in their motion for partial summary judgment and the brief in support thereof.

improperly collected money (1) without "giving thirty (30) days advance written notice as required" (doc. 95 at ¶ 24(b)), (2) "that was in excess of the amount of the defendants' contributions to the [fund]" (*id*. at ¶ 24(d)), (3) "for expenses incurred in complying with the government [fund] assessments not permitted by the contracts" (*id*. at ¶ 24(e)), (4) for expenses other than those "associated with administering the [fund] contributions" (*id*. at ¶ 24(f)), and (5) "by earning and obtaining interest or other economic gain through use of funds collected... [that were] not permitted by the contracts" (*id*. at ¶ 24(g)).

To the extent that the plaintiff's contract claims seek an interpretation of *Texas Office* mandating return of any universal service contributions recovered from customers during the period of about January 1998 and October 31, 1999, and challenge FCC orders that permit Cingular to retain those contributions, the motion for summary judgment is due to be denied (that is, the court lacks jurisdiction to hear these claims).  To the extent the contract claims require this court to rule on the applicability or validity of any order of the FCC (*e.g*., the Universal Service Order, the Fourth Order on Reconsideration, the Fifth Circuit Remand Order, the Truth-in-Billing Order, the Second Truth-in-Billing Order, or the 2008 Order), the motion is due to be denied. However, to the extent the contract claims allege that the defendants unreasonably or unjustly assessed costs, the claims are not preempted.[21]  Likewise, to the extent that the plaintiff's contract claims simply require an interpretation of contract language and application of state law contract principles, the plaintiff's motion for summary judgment is due to be granted (that is, the court finds that it does have jurisdiction to hear these claims).[22]

---

[21]However, as noted previously, an allegation that the defendants collected unrelated costs or costs not associated with the universal service charge is not enough.  Those claims are preempted except to the extent that the defendants collected unrelated costs in an unjust or unreasonable manner.

[22]Subject to the court's further evaluation of preemption principles, which will be discussed below.

### b.        Unjust Enrichment and Conversion Claims

The plaintiff argues that the court has jurisdiction over her unjust enrichment and

conversion claims because they do not call into question the FCC's Fourth Order.  (Doc. 141 at

p. 19).  To the extent that these claims assert that the defendants have recovered and retained

more than is permitted under the plaintiff's contract and FCC orders, this court has jurisdiction of

the claims.  To the extent that the assessment or collection of these monies implicates the validity

of any FCC order, the court is without jurisdiction to consider the same.[23]

### c.        Fraud Claims

The plaintiff alleges that her "fraud claims do not challenge any FCC regulation or order

regarding the lawfulness of USF charges but simply challenge Cingular's representations

regarding the nature and requirements of the USF charges."  (Doc. 141 at p. 20).  She further

states:

> Self contends that Cingular made misrepresentations or omissions regarding the
> nature of its recovery program that were inaccurate, incomplete, or not truthful,
> including that USF contributions recovered from customers was required by
> federal law; that the amounts paid by customers were to offset Cingular's actual
> cost and contributions to the USF rather than in excess thereof; and that Cingular
> was entitled to receive all monies collected from its customers.

*Id*.

To the extent the plaintiff's fraud claims are premised on misrepresentations or omissions

apart from the validity of any FCC order, this court does possess the requisite jurisdiction to

consider the same.  To the extent that the plaintiff might assert that a fraud claim is premised on

the invalidity of any FCC order, the claim is precluded.  The motion for summary judgment,

---

[23]As with the contract claims, the defendants' detailed preemption arguments will be discussed below.

therefore, is due to be granted in part and denied in part as to this claim.[24]  *See Russell v. Sprint Corp.*, 264 F. Supp. 2d 955, 962 (D. Kan. 2003) (allowing a claim "based on the alleged misrepresentation of the amount charged, 'not on the wrongfulness of the charge itself.'").[25]

### d.  Conspiracy

The plaintiff alleges that the defendants "conspired among themselves and/or their subsidiaries, affiliates, partners, joint ventures, and FCC cellular telephone licensees to perform those acts and activities set forth [in the amended complaint] thereby proximately causing the plaintiff and other class members to be damaged." (Doc. 95 at ¶ 40).  In sum, the plaintiff's conspiracy claim is premised on the other substantive claims in the amended complaint. Accordingly, the court's previous findings herein apply to this count of the complaint.

### D.  Preemption

In its motion for partial summary judgment, the defendants assert that many of the plaintiff's claims are preempted from review by this court.  The plaintiff disagrees.

### 1.  Overview

The Supremacy Clause of the Constitution mandates that the laws of the United States be the "supreme Law of the Land[,] and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. CONST. art. VI, cl. 2.  "The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368, 106 S. Ct. 1890, 1898, 90 L. Ed. 2d 369 (1986).  "[A] federal agency acting within the scope of its congressionally

---

[24]The defendants' preemption arguments will be discussed below.

[25]*Citing and quoting In re Universal Serv. Fund*, 247 F. Supp. 2d 1215, 1225 (D. Kan. 2002) (unfair competition claims were tied to claim of alleged misrepresentation and therefore did not challenge lawfulness of charges controlled by federal law; no substantial federal question).

delegated authority may pre-empt state regulation." *Id*. at 369, 106 S. Ct. at 1887-88.

"Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *Fid. Fed. Sav. & Loan v. De la Cuesta*, 458 U.S. 141, 153-54, 102 S. Ct. 3014, 3022-23, 73 L. Ed. 2d 664 (1982) (quoting *United States v. Shimer*, 367 U.S. 374, 381-82, 81 S. Ct. 1554, 1560, 6 L. Ed .2d 908 (1961)).  Where a federal agency preempts state law, "the inquiry becomes whether the federal agency has properly exercised its own delegated authority rather than simply whether Congress has properly exercised the legislative power." *New York v. FCC*, 486 U.S. 57, 68, 108 S. Ct. 1637, 1642, 100 L. Ed. 2d 48 (1988).  "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan*, 458 U.S. at 153, 102 S. Ct. at 3022.

Federal law may preempt state law in three ways.  First, express "[p]re-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law." *La. Pub. Serv. Comm'n*, 476 U.S. at 368, 106 S. Ct. at 1898.  Second, conflict preemption occurs "when there is outright or actual conflict between federal and state law." *Id*.  Third, field preemption occurs "where compliance with both federal and state law is in effect physically impossible." *Id*.  "[T]he categories of preemption are not rigidly distinct . . . field pre-emption may be understood as a species of conflict pre-emption." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288, 2294, 147 L. Ed. 2d 352 (2000); *see* Caleb Nelson, Preemption, 86 Va. L. Rev. 225, 262 (2000).

" '[T]he purpose of Congress is the ultimate touchstone' of pre-emption analysis." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 2617, 120 L. Ed. 2d 407 (1992) (plurality opinion) (quoting *Malone v. White Motor Corp*., 435 U.S. 497, 504, 98 S. Ct. 1185, 1189, 55 L. Ed. 2d 443 (1978)).  "[A]ny understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86, 116 S. Ct. 2240, 2250, 135 L. Ed. 2d 700 (1996).  "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Id*. (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 1309, 51 L. Ed. 2d 604 (1977)).  Courts interpret the text of the statute and apply traditional cannons of statutory construction to discern the intent of Congress.  *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 229, 114 S. Ct. 2223, 2231, 129 L. Ed. 2d 182 (1994); *see, e.g., La. Pub. Serv. Comm'n*, 476 U.S. at 369, 106 S. Ct. at 1899.

"When we consider issues that arise under the Supremacy Clause . . ., we start with the assumption that the historic police powers of the states are not

superseded by federal law unless preemption is the clear and manifest purpose of Congress." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004).

*National Association of State Utility Consumer Advocates v. FCC*, 457 F.3d 1238 (11th Cir. 2006).

### 2.       Conflict Preemption

The defendants argue that the plaintiff's state law claims are preempted by the doctrine of conflict preemption. (Doc. 144 at pp. 24-37). Specifically, they assert,

> . . . even if Congress has neither expressly preempted state law nor occupied the field, state law is preempted when it actually conflicts with federal law. "Conflict preemption," as it is commonly known, arises in two circumstances: when it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of federal law. *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372-73, 120 S. Ct. 2288, 2294, 147 L. Ed. 2d 352 (2000).

(Doc. 144 at p. 25 (quoting *Cliff v. Payco General American Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004))). The plaintiff, however, argues that her claims are not preempted because: (1) the FCC has previously held that practices similar to the ones complained about in her complaint were contrary to FCC regulations; (2) the FCC has never determined that the specific conduct described in Self's complaint was permitted by federal regulation or rule; and (3) there must be an actual conflict between the relief sought and the federal agency regulations promulgated within the scope of the agency's delegated authority - - therefore, compliance with both state and federal law would have to be a "physical impossibility" or her claims must stand as an obstacle to Congress's accomplishing its full purpose in passing the FCA.[26] (Doc. 150 at

---

[26]As discussed in the court's analysis regarding jurisdiction, the plaintiff's arguments that preemption does not apply because Cingular's actions were voluntary, the Fourth Order on Reconsideration is directory and interpretive, rather than mandatory; and the FCC's actions were void *ab initio* are unpersuasive.

pp. 5-6).

> 3.    **Analysis**

The conflict preemption doctrine does not require the court to find express language of preemption in the federal law, nor is it necessary to find that Congress intended to preempt an entire field or subject with its legislation.  Conflict preemption exists "even if Congress has neither expressly preempted state law nor occupied the field." *Cliff*, 363 F.3d at 1122 (internal citations omitted); *see also Sprint Corporation*, 846 F. Supp. at 1506 (internal citations omitted). Additionally, a "federal agency acting within the scope of its congressionally delegated authority" may act to preempt state law.  *Cliff*, 363 F.3d at 1127, n.9 (quoting *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 369 (1986)).

> a.    **The *Universal Service Fund Litigation***

In *Universal Service Fund Litigation*, 300 F. Supp. 2d 1107 (D. Kan. 2003), the district court considered a number of claims concerning universal service fund assessments after the plaintiffs brought state law challenges to carriers' arbitration provisions.  The court held that some of these claims were preempted.  Relying on Supreme Court precedent, the court reasoned that "[a]pplying the laws of all fifty states to defendants' interstate long distance service contracts would impede the Congressional objective of achieving this uniformity."  *Universal*, 300 F. Supp. 2d at 1119.  The court also found that if courts applied the various state laws "the result would be that no uniform body of federal law would emerge to guide long distance carriers such as AT&T and Sprint in attempting to ascertain the lawfulness of the provisions in their service agreements."  *Id*. at 1120.  Based on this reasoning, the court held that state law claims against carriers for money had and received were preempted because the claims were a direct challenge

to the propriety of defendants' rates, terms, and conditions of service.  *Id*. at 1144-45.

Specifically, the court reasoned

[T]he FCA preempts plaintiffs' state law challenges to the propriety of defendants' rates, terms, and conditions of service.  Plaintiffs' only vehicle to raise such a challenge is to bring a claim under the FCA alleging that the carriers rates, terms, and conditions of service are unjust, unreasonable, and/or discriminatory.  However, the FCA does not preempt claims involving the manner in which carriers implement or fail to adhere to their own rates, terms, and conditions of service.  Therefore, the court must examine the nature of each of the plaintiffs' claims to determine whether those claims are preempted by the FCA.

*Id*.  In so doing, the court found that the claims focused on the propriety of the defendants' rates, terms, and conditions of service were preempted.  The district court did not, however, extend its holding to the state law breach of contract and state consumer law claims before it.  It found, instead, that those particular claims did not implicate rates, terms and conditions of service, but rather concerned contract formation or an allegation that carriers misrepresented the nature of the charge or failed to adhere to their rates, terms, and conditions in contracts.  *See id.*

However, Cingular argues that the contract claims in the present case are materially different from those in *Universal Service Fund Litigation*.  Specifically, Cingular argues that the plaintiff's claims here concern rates, terms, and conditions of her service contract with Cingular.  As to the misrepresentation claims in *Universal Service Fund Litigation*, Cingular argues that there is no indication that the district court considered the regulations of the FCC about the types of communications that carriers should have with their customers concerning the assessment and that those regulations made clear that disclosures must be accurate and truthful and that they were subject to a § 201(b) and § 202(a) standard.  According to Cingular, these regulations show that the plaintiff's fraud claims in the present case are also preempted under the conflict

53

preemption doctrine.  The court will address each of the plaintiff's claims below.

> **b.      The State Law Claims in Paragraphs 24(a), 30(b), and 36(d) of the Complaint**[27]

For the most part, these claims do not allege that the defendants failed to adhere to the terms of the contract between the parties, but instead appear to challenge the propriety of the assessment of USF charges based on intrastate usage.  As stated previously herein, in the 2008 Order and the 2005 Bureau Order addressing BellSouth's Petition, the FCC reaffirmed its previous holdings (the Fifth Circuit Remand Order and the Fourth Order on Reconsideration) that cellular carriers could recover their universal service contributions from interstate rates for all services—intrastate and interstate—regardless of whether a customer makes any interstate calls.  Similarly, the FCC has made it clear that subsequent to November 1, 1999, intrastate revenues are not to be used for determining the universal service fee assessment.  Each of the plaintiff's claims in this section would require, at least in part, for the court to rule on the validity of FCC's orders that involve that assessment.  Therefore, summary judgment is due to be granted in part with respect to the claims found in ¶¶ 24(a) and 30(b) & 36(d) to the extent the plaintiff is challenging FCC orders.  They are preempted as challenges to FCC orders which authorized and permitted the pass through of USF charges based upon intrastate rates.

---

[27] The cited claims contain the following allegations:

> 24(a) - breach of contract "by assessing, collecting, receiving, transmitting, and retaining monies from plaintiff and class members for reimbursement of their FUSF assessments based on revenue derived from customers' intrastate cellular telephone usage or service;"

> 30(b) - unjust enrichment/money had and received/conversion by assessing and collecting money from plaintiff and other class members not permitted to be collected by federal law or the contracts between defendants and the class members;

> 36(d) - misrepresentation and suppression - the defendants suppressed material facts that they were under a duty to disclose or communicate to the plaintiff and other class members, including that a portion of the USF charge reflected on customer bills was based upon customer revenues from intrastate revenue which defendants were not entitled to collect in connection with funding for the USF program.

However, to the extent the plaintiff alleges that Cingular received, transmitted, and/or collected monies above and beyond the amount authorized by FCC orders and the contract, the defendants' motion for summary judgment is due to be denied as those are purely matters of state contract law.

### c.      The State Law Claims in Pragraphs 24(b), 24(c), 30(a), and 30(c) of the Complaint[28]

In these paragraphs, the plaintiff claims that her contract did not permit recovery of Cingular's contributions to the universal service fund, that her contract did not permit assessment of Cingular's universal service contributions before Cingular gave 30 days advanced written notice, and that certain expenses and costs related to the contributions were improperly recovered.  Cingular argues that these claims are preempted because the FCC expressly allowed for contract adjustments in this context, and that even though there was no need for a contract adjustment under the terms of the service agreement, the plaintiff received notice of the assessment and could have terminated her service.  (Doc. 144 at pp. 32-34).  Cingular also states that the plaintiff's contract provided that she "was responsible for 'other charges billed to Customer's cellular access number including the...fees or other exactions imposed by or for any

---

[28] The cited claims contain the following allegations:

24(b) - breach of contract by assessing and collecting money for FUSF charges from the plaintiff and other class members prior to giving 30 days advance written notice as required by the contracts;

24(c) - by assessing, collecting, and receiving monies from plaintiff and class members for contribution assessments of defendants to the FUSF that was not permitted to be collected by defendants from the plaintiff and other class members pursuant to the terms of the contracts;

30(a) - unjust enrichment - assessing and collecting monies from plaintiff and the other class members based on revenue derived from intrastate telecommunications of plaintiff and other class members not allowed by federal law or the contracts between defendants and the class members;

30(c) - assessing and collecting monies from the plaintiff and other class members to reimburse the defendants for expenses and costs incurred in connection with their USF contributions not permitted by the contracts between the defendants and class members.

municipal or political authority against Company."  *Id*. at p. 32.  Finally, it notes that the FCC in its Universal Service Order stated that changes in existing contracts are allowed to accommodate this "new cost of doing business."  *Id*. at p. 34 (citing Universal Service Order at ¶ 851).  The plaintiff responds that the "FCC did not and could not allow Cingular to unilaterally amend its contract with its customers."  (Doc. 150 at p. 21).

The plaintiff's service contract provides that she was responsible for "other charges billed to Customer's cellular access number including the…fees or other exactions imposed by or for any municipal or political authority against Company" (hereinafter "'exaction' provision") (Cingular Ex. 1, p. 4 at ¶ 8(b)).  The contract further provides that Cingular can "adjust rates, terms and conditions…upon at least 30 days written notice to customer."  *Id*.  The "exaction" provision is a term and condition of the contract.  That provision was not changed when Cingular began assessing the plaintiff for its universal service fund payment.

With regard to ¶ 24(b), which deals with the thirty (30) day advance written notice provision in the contract, the court finds that the claim is preempted by ¶ 851 of the Universal Service Order which allows for adjustments to the contract.  Additionally, the court finds that substantively, the defendants' motion for summary judgment would also be due to be granted on this claim as the court agrees with the defendants that they were not required to give thirty (30) days notice due to the exaction language in the contract.

With regard to ¶ 24(c), which deals with the assessing, collecting, and receiving monies from the plaintiff, the court finds that the claim is preempted in part.  To the extent that the plaintiff's claims cited in this section would require, at least in part, for the court to rule on the validity of the FCC's orders that involve an assessment of said fees, the claim is preempted.

Again, the FCC orders authorize and permit the pass through of USF charges based upon intrastate rates until November 1, 1999.  To the extent the plaintiff seeks recovery for breach of contract other than premised on *Texas Office* and FCC orders, the motion is denied.

To the extent the plaintiff challenges the propriety of the defendants' assessment and collection of the USF charge in ¶ 30(a), which relates to intrastate assessments, this claim is also preempted, except to the extent the plaintiff alleges that the defendants collected more than they were entitled to.

With regard to ¶ 30(c), which concerns expenses and costs incurred in connection with the universal service fee, the court finds the claim is not preempted to the extent the plaintiff alleges and can demonstrate that the defendants improperly assessed and collected for reimbursement of expenses and costs *after* April 1, 2003 (*e.g.*, assessment in excess of interstate telecommunications portion of a customer's bill times the relevant contribution factor).  (See December 13, 2002, FCC Report and Order (Cingular Ex. 4, pp. 27-28 at ¶¶ 49-53)).  To the extent the plaintiff alleges that the monies were assessed and collected before that date, the claim is preempted unless the plaintiff can show the court an earlier order stating that expenses and costs could not be collected.

> **d.**    **The Plaintiff's State Law Claims in Paragraphs 24(c), 24(d), 24(e), 24(f), 24(g), 30(d), 30(e), 30(f), and 30(h) in the Complaint**[29]

---

[29]   The cited claims contain the following allegation:

24(c) - breach of contract by assessing, collecting, and receiving monies from plaintiff and class members for contribution assessments of defendants to the FUSF that was not permitted to be collected by defendants from plaintiff and other class members pursuant to the terms of the contracts;

24(d) - by assessing and collecting the FUSF charge from the plaintiff and other class members in an aggregate sum that was in excess of the amount of the defendants' contributions to the FUSF;

24(e) - by collecting monies from plaintiff and other class members for expenses incurred in complying with the

The claims in this group concern the amount that Cingular assessed and collected from the plaintiff.  Cingular argues that these state law claims simply aver that Cingular could not recover expenses and costs from their universal service contributions or could not recover more than the amount of their contributions (paragraphs 24(c), 24(d), 30(c), 30(d), and 30(e)) and are preempted because they directly conflict with the FCC's rules and pose an obstacle to objectives of the universal service program and in any event involve Cingular's rates, terms, and conditions of service.  (Doc. 144 at pp. 34-35).

To the extent this challenge concerns ¶ 24(c), which deals with the assessing, collecting, and receiving monies from the plaintiff, the court finds that the claim is preempted in part as already discussed.

To the extent this challenge concerns ¶ 24(d), which assessment and collection is in an aggregate sum in excess of the defendants' contributions, the claim is not preempted.

To the extent this challenge concerns ¶¶ 24(e) and 30(d), which deal with colleting money for expenses and costs incurred in complying with the universal service fee, the claim is not

---

government FUSF assessments not permitted by the contracts;

24(f) - by collecting monies that were applied toward expenses incurred by the defendants other than expenses associated with administering FUSF contributions;

24(g) - by earning and obtaining interest or other economic gain through the use of funds collected not permitted by contracts;

30(d) - unjust enrichment - assessing and collecting to reimburse the defendants for expenses and costs incurred in connection with their USF contributions not permitted by the contracts;

30(e) - assessing and collecting monies for reimbursement for USF assessments from which the defendants generated income which should be refunded or credited;

30(f) - assessing and collecting monies used to reimburse the defendants for expenses incurred unrelated to the defendants administration of the USF program; and

30(h) - assessing and collecting USF charges in a manner that shifted more than an equitable share of contributions to a group of customers; gave unreasonable preference or advantage to particular classes of customers; and that constitutes discriminatory practices and classifications to certain groups of customers.

preempted to the extent the plaintiff alleges that the defendants collected more than what was authorized by FCC orders and the contract.

To the extent this challenge concerns ¶¶ 24(f) and 30(f), which deal with collecting money for expenses and costs unrelated to the universal service fee, they are not preempted to the extent the plaintiff alleges that those unrelated costs were unjust and/or unreasonable.

To the extent this challenge concerns ¶¶ 24(g) and 30(e), which deal with interest and other economic gain through use of the universal service fees, the defendants have not convinced the court that the claims are preempted.[30]

To the extent this challenge concerns ¶ 30(h), which deals with the plaintiff's challenge that the assessment and collection process was inequitable in its impact on a particular group of customers, this claim is preempted by the FCC's Fourth Order on Reconsideration and the 2005 Bureau Order.

    e.    **The Plaintiff's State Law Claims in Paragraphs 33(a) through 33(d), 36(a) through (e), and 37 of the Complaint**[31]

---

[30] Although the burden is presently on the defendants, the plaintiff has also not convinced the court that there is any merit to these claims either.

[31] The cited claims contain the following allegations:

33.  Defendants made misrepresentations of fact and failed to provide accurate truthful and complete information such that the information provided was misleading to plaintiff and the other class members through billing statement inserts and other means in January, 1998 and thereafter, including, but not limited to:

(a)  that charges for USF contributions as set forth on the bills were required by federal law;

(b) that amounts charged as a USF charge was to reimburse defendants for their "contribution" to the USF;

(c) that defendants were entitled to charge and collect all monies assessed and collected as a USF charge;

(d) that all monies collected as a USF charge would be paid or was a result of payments made by defendants to the USF as contributions; and

36.  Defendants further suppressed material facts which they were under a duty to disclose or communicate to plaintiff and the other class members including, but not limited to:

(a) that a portion of USF charge reflected on customer bills was for expenses incurred in connection with administering

The defendants argue that the FCC's orders make clear its intent to control and oversee the disclosures that carriers made about recovery of their universal service fund contributions. (Doc. 144 at pp. 35-36).  While the defendants recognize that the district court in *Universal Service Fund Litigation* declined to find state law consumer statutes preempted in part because there were elements of misrepresentation in the claims, they assert that there is no indication in the opinion that the court had before it the many orders of the FCC governing accurate and truthful disclosures about the assessment.  According to the defendants:

> Plaintiff's misrepresentation and deceit claims are preempted based on these orders because they stand as an obstacle to Congress's objectives in promoting universal service.  It is important to place the misrepresentation claims in context of the FCC's regulations at the time and in the years thereafter.  The FCC expressly exercised its Section 201, 202 and 254(d) jurisdiction in authorizing carriers to recover the costs of their universal service contributions through line-item charges, as well as the manner in which they do so.  At the time that the universal service program was being established it would have been disruptive to the program for a carrier to have obligations based on potentially fifty state laws about the types of disclosures it should make about the assessment.  The FCC was and is in the best position to assess the nature and quality of disclosures about the program, and it has in order after order expressed its views.  These orders show the FCC's intent to regulate disclosures about universal service under Communications Act standards, and according to the doctrine of conflict

---

USF program;

(b) that the USF charge reflected was more than the defendants' contribution and expenses associated with administering the USF program;

(c) that a portion of USF charge reflected on the bills was to reimburse defendants for expenses unrelated to the administration of the USF fund;

(d) that a portion of the USF charge reflected on customer bills was based upon customer revenues from intrastate revenue which defendants were not entitled to collect in connection with funding for the USF program; and

(e) that defendants derived additional revenue from the use of monies received pursuant to the USF charge reflected on the customers' bills which resulted in defendants receiving monies in excess of their contribution and expenses for the USF program; and

37.   All defendants fraudulently concealed from plaintiff and the class members that they were assessing and receiving monies from plaintiff and the class members pursuant to the USF charge reflected on the customer bills to which they were not entitled.

preemption, any claims concerning disclosures should be brought under the
Communications Act.

(Doc. 144 at p. 36).

As stated previously, to the extent these claims are based on an allegation that the
defendants made misrepresentations that were unrelated to any FCC orders, they are not
preempted.  Therefore, to the extent the plaintiff is alleging the particular contract language
chosen by the defendants were arguably misleading or deceptive, the claims are not preempted.
However, to the extent the plaintiff is challenging the substance or propriety of those statements
pursuant to FCC orders, the claims are preempted.

### f.        The Plaintiff's FCA Claims

As discussed previously, the plaintiff also challenges the defendants' conduct under §§
201(b) and 202(a).  Premised on the findings in section "V.C." herein, the court finds that the
FCA claim is preempted in part.

## VI.    CONCLUSION

Premised on the foregoing, the motions for partial summary judgment (doc. 137 and 138)
are granted in part and denied in part.  An appropriate order will be entered.

**DONE,** this 21st day of April, 2008.

_John E. Ott_
**JOHN E. OTT**
United States Magistrate Judge

61